Blair RIGGS, Plaintiff-Appellee,

v.

ISLAND CREEK COAL COMPANY,
Defendant-Appellant.

No. 75–1699.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 18, 1975.

Decided Sept. 28, 1976.

Rehearing and Rehearing En Banc Denied
Nov. 30, 1976.

Barton D. Whitman, Robert T. Keeler, Taft, Stettinius & Hollister, Cincinnati, Ohio, for defendant-appellant.

Thomas D. Beetham, Robt. B. Werren, Beetham & Beetham, Cadiz, Ohio, Philip E. Howes, Canton, Ohio, for plaintiff-appellee.

Before CELEBREZZE, LIVELY and EN-GEL, Circuit Judges.

ENGEL, Circuit Judge.

The principal issue in this diversity case involves which of two conflicting descriptions in a warranty deed for coal is controlling under Ohio law.

On April 27, 1923 plaintiff Blair Riggs' predecessor in interest conveyed to defendant Island Creek Coal Company's predecessor in interest:

" . . . all the coal of the No. six vein or seam, being more particularly and definitely described as that certain vein or seam of coal which lies 170 feet below the surface of the southeast corner of the Healey Latham farm in said township, Drill Hole No. 5, and which vein or seam of coal lies 190 feet below the surface on the William Hoop farm in said township, Drill Hole No. 4, within and underlying the following described lands. Situated in the County of Harrison, State of Ohio, and in the Township of Freeport, and being the Northwest quarter of Section No. 22 in Township No. 11 of Range No. 7 in Steubenville Land District, containing 160 acres more or less."

The difficulty with the foregoing description is that the vein of coal which lies "170 feet below the surface of the southeast corner of the Healey Latham farm in said township Drill Hole No. 5, and which vein or seam of coal lies 190 feet below the surface on the William Hoop farm" is actually presently known as the No. 7 seam, and not the No. 6 seam as indicated in the deed. From 1968 until the end of 1972 Island Creek, purportedly relying upon its rights in the deed, mined the No. 7 seam. Plaintiff's suit for trespass was removed on petition of defendant from the Harrison County Common Pleas Court to the United States District Court for the Southern District of Ohio, Eastern Division, sitting at Steubenville.

In a bifurcated bench trial, the district judge on January 18, 1974 ruled in favor of Riggs on the issue of liability.[1] Proceeding

---

1. *Riggs v. Island Creek Coal Co.,* 371 F.Supp. 287 (S.D.Ohio 1974).

"on the assumption that the defendant's taking of the coal was not an innocent mistake" the district judge in a subsequent opinion awarded damages of $1,279,793.70.

Defendant appeals. We reverse and remand for entry of judgment in favor of defendant.

## JURISDICTION

At the outset, this appeal presents an unusual jurisdictional question.

Defendant's petition for removal from the common pleas court was filed in the district court on August 10, 1970. After alleging that the plaintiff was a citizen and resident of the State of Ohio, the removal petition alleged that "the defendant, Island Creek Coal Company, was, and still is, a corporation, incorporated and existing under and by virtue of the laws of the State of Delaware, and a citizen and resident of that state, having principal place of business in the City of Cleveland, State of Ohio." We think it is clear to the district judge and to the parties now that upon its face the petition for removal affirmatively demonstrates an absence of diversity jurisdiction under "the principal place of business" test of 28 U.S.C. § 1332(c). However, no motion to remand was made by the defendant prior to the judgment on liability, nor did the court *sua sponte* question its jurisdiction.

On March 8, 1974, the defendant filed a "Suggestion of Lack of Jurisdiction", and attached in support an affidavit of the president of Island Creek Coal Company, Mr. Stonie Barker, Jr. As quoted in the district court opinion,[2] Mr. Barker's affidavit in part stated:

"In 1970 we had one active mine field known as the Vail Mine in the State of Ohio and two active mines in the State of Pennsylvania. The bulk of our mining operations was conducted in the States of Virginia, West Virginia and Kentucky. In November 1972, the Vail Mine was placed on an inactive status; and Island Creek has not since that time conducted active mining operations in the State of Ohio."

Relying essentially upon the affidavit, the district judge made an express finding that at the time the case was removed in 1970, diversity of citizenship existed, notwithstanding the defendant's allegation that its principal place of business was at that time in Cleveland, Ohio. The basis for his holding was that the applicable case law is "virtually unanimous" in holding that the principal place of business of a mining company is not determined by the "home office" test, but rather by a "place of operations" test, citing *Mattson v. Cuyuna Ore Co.*, 180 F.Supp. 743 (D.Minn.1960); *Hodges v. Georgia Kaolin Co.*, 207 F.Supp. 374 (M.D.Ga.1962); *Potocni v. Asco Mining Co.*, 186 F.Supp. 912 (W.D.Pa.1960), and our decision in *Continental Coal Corp. v. Roszelle Bros.*, 242 F. 243 (6th Cir. 1917).[3] Although the question posed in *Roszelle* was the principal place of business of a mining corporation under the Bankruptcy Act, we see no essential difference in the statutory standard.[4]

**2.** *Riggs v. Island Creek Coal Co.*, 387 F.Supp. 1363, 1365 (S.D.Ohio 1974).

**3.** We noted in *Roszelle*:

But we think the place where the principal office is located is not necessarily the place where the principal business is carried on. Such may or may not be the case. Nor as between the place where a mining corporation's actual operations are carried on and the place where the selling is done and the principal office maintained can the latter be declared in all cases, as matter of law, the principal place of business. All the authorities recognize, as do counsel, that the ques-

tion as to the place where the bankrupt carried on its principal business is purely one of fact. Each case depends upon its own special circumstances. Neither of the cases cited by appellants is on all fours with the instant case. Where a corporation has more than one mine, quarry, or manufacturing plant, situated in different districts, its office from which supreme direction and control of the business generally is had, including the operations of the several plants, may, and perhaps must, be deemed the principal place of business.

**4.** 1958 U.S.Code Cong. & Ad.News, pp. 3101–2.

The district court thus concluded that the existence of the corporate headquarters in Cleveland was irrelevant because it was apparent that only a small portion of Island Creek's mining operations was conducted in the State of Ohio. Without determining in which state Island Creek's principal place of business was, the court thought it sufficient to find that in any event it was not Ohio. Beyond that, the district court held that even if its finding of defendant's principal place of business in 1970 was reversed,

" . . . the defendant's judicial admissions now of record show clearly that defendant's principal place of business now is in either Kentucky, Virginia, West Virginia, or even perhaps California: certainly not Ohio. Similarly, these admissions and the whole of the present record show that defendant's principal executive offices ("home office" if you will) are now in Lexington, Kentucky. But, plaintiff is still an Ohio citizen. Thus, even if this Court were found without jurisdiction and the present case dismissed, no reason appears why plaintiff could not now amend his complaint or even file a new action in this same Court to relitigate all of these same issues before the same judge because diversity certainly exists at the present time under any test and the Court can conceive of no statute of limitations which operation is not now suspended by this plaintiff's diligence in protecting his claim. Such a result would be clearly absurd." [5]

◼ We recognize that the determination of a corporation's principal place of business under 28 U.S.C. § 1332(c) is a question of fact and thus on review subject to the clearly erroneous rule. *American Foundation, Inc. v. Mountain Lake Corp.,* 454 F.2d 200 (5th Cir. 1972); *Brown v. Kingsport Publishing Corp.,* 321 F.Supp. 1352 (E.D.Tenn. 1971).

◼ While we agree with the cited cases that a mining corporation's headquarters may not invariably govern the location of its principal place of business, we think that the evidence submitted and the district court's negative finding were insufficient to establish the affirmative requirement of jurisdiction at the time of removal. The affidavit relied upon by the district court simply stated that the bulk of defendant's mining operations was conducted in three states other than Ohio. There is no recitation of tonnage produced, the number of people employed, or the physical assets owned in each state. If the "bulk of the mining operations" were shown to be located in one state, we could accept the district court's conclusion that that state constituted the corporation's principal place of business. However, here the "bulk" of the operations was divided in some unknown proportion among three states. In such a situation, the corporation's headquarters assumes more significance as the compelling factor in the principal place of business test. "Where a corporation has more than one mine . . . situated in different districts, its office from which supreme direction and control of the business generally is had, including the operations of the several plants, may, and perhaps must, be deemed the principal place of business." *Continental Coal Corp. v. Roszelle Bros.,* 242 F. 243 (6th Cir. 1917). This conclusion, however, does not end the matter.

◼ Recognizing that Island Creek had moved its corporate headquarters to Lexington, Kentucky in July 1973, the trial judge justifiably felt that dismissal of plaintiff's case would lead to an absurd result because diversity of citizenship existed at the time of trial and rendition of judgment in any event. His conclusion was sound. On the facts before him, he could properly have held that the defendant was estopped from asserting absence of diversity of citizenship where no objection to the court's jurisdiction was raised until after the date of judgment and where it is clear that at the time of judgment diversity of citizenship did in fact exist.

---

5. 287 F.Supp. at 1366. Defendant's brief on appeal confirms that as of July 1973, its principal place of business was in Kentucky.

■ We recognize that the existence of federal jurisdiction may be questioned at any point in the course of litigation and that parties cannot waive the requirement of subject matter jurisdiction. *American Fire & Casualty Co. v. Finn,* 341 U.S. 6, 71 S.Ct. 534, 95 L.Ed. 702 (1951). However, in the instant case the district court unquestionably possessed the power to render judgment where at the time of judgment diversity of citizenship existed.

The Supreme Court in *Grubbs v. General Electric Credit Corp.,* 405 U.S. 699, 92 S.Ct. 1344, 31 L.Ed.2d 612 (1972), held that although the removal statute, 28 U.S.C. § 1444, was perhaps improperly invoked, jurisdiction in fact existed on the basis of diversity of citizenship between petitioner and respondent with the requisite amount in controversy.

"We have concluded that, whether or not the case was properly removed, the District Court did have jurisdiction of the parties *at the time it entered judgment . . .* We conclude that the requirement that jurisdiction exist *at the time of judgment,* stated in [*American Fire & Casualty Co. v. Finn,* supra] is satisfied here where the District Court had jurisdiction to render judgment . . ." (emphasis added) *Grubbs,* at 700, 705, 92 S.Ct. at 1346, 1349.

The Court's citation of *American Fire & Casualty Co. v. Finn,* supra, in *Grubbs* stems from that opinion's recognition of the principle which, although inapplicable to the facts of *Finn,* states that a defendant may be estopped from protesting that there was no right to removal.

"There are cases which uphold judgments in the district courts even though there was no right to removal. In those cases the federal trial court would have had original jurisdiction of the controversy had it been brought in the federal court in the posture it had at the time of the actual trial of the cause or of the entry of the judgment. That is, if the litigation had been initiated in the federal court on the issues and between the parties that comprised the case at the time of trial or judgment, the federal court would have had cognizance of the case. This circumstance was relied upon as the foundation of the holdings. The defendant who had removed the action was held to be estopped from protesting that there was no right to removal. Since the federal court could have had jurisdiction originally, the estoppel did not endow it with a jurisdiction it could not possess." *Finn,* 341 U.S. at 16–17, 71 S.Ct. at 541.

We note that the Supreme Court in *Finn* ordered the cause remanded to the district court "with directions to vacate the judgment entered and, *if no further steps are taken by any party to affect its jurisdiction,* to remand the case to the District Court of Harris County, Texas . . . ." *Finn,* at 18–19, 71 S.Ct. at 542 (emphasis added). Taking his cue from the language emphasized and from the appended footnote, the plaintiff dismissed the resident defendant whose existence had destroyed diversity jurisdiction. The Fifth Circuit thereafter held that the prior judgment for the plaintiff could stand and that the trial court to which the cause had been remanded erred in ordering a new trial. *Finn v. American Fire & Casualty Co.,* 207 F.2d 113 (5th Cir. 1953), *cert. denied,* 347 U.S. 912, 74 S.Ct. 476, 98 L.Ed. 1069 (1954).

"In *Finn* this court held that where a first trial was free from error apart from a jurisdictional matter, a new trial was not mandatory and judgment could be entered on the original verdict after the correction of the jurisdictional flaw by the dismissal of a non-diverse defendant."

*Eklund v. Mora,* 410 F.2d 731, 732 (5th Cir. 1969). See also, *Stokes v. Merrill Lynch, Pierce, Fenner & Smith,* 523 F.2d 433 (6th Cir. 1975); *Brough v. United Steelworkers of America,* 437 F.2d 748 (1st Cir. 1971); *Craig v. Champlin Petroleum Co.,* 421 F.2d 236 (10th Cir. 1970); But see, *Roecker v. United States,* 379 F.2d 400 (5th Cir. 1967).

## THE DEED

■ In his opinion holding the coal company liable upon the merits, the district judge made the following finding:

"The Court further finds, as matters of fact, that the true intent of the original parties to the deed in question was to convey the "No. 6 vein" of coal only; that the normal and accepted usage in Eastern Ohio at the time the deed was made was to convey strata of coal by seam or vein number and not by drill hole depths; that the grantor of the deed in question would have assigned no significance at all to the recital of drill hole depths in the deed because as an ordinary and reasonably prudent man in Eastern Ohio he would not have made conveyance of a seam of coal in that manner; that inasmuch as the drill hole depths recited in the deed were not even on his land, the grantor of the original deed cannot be charged with any particular knowledge as to their significance, if any; that coal is most properly, commonly, and particularly described by miners, the general populace, and the legal profession as per its seam number without reference to drill holes; that any reference on the face of defendant's deed to drill hole depths is mere surplusage; that such surplusage is absolutely without meaning absent extraneous experimentation totally divorced from the face of the deed itself; and, finally, that defendant acted wrongfully and unreasonably in relying on the drill hole depths recited in its deed, rather than properly on the coal vein number, as a pretext to go onto the land of plaintiff and remove the No. 7 vein of coal therefrom."

*Riggs v. Island Creek Coal Co.,* 371 F.Supp. 287, 290 (S.D.Ohio 1974).

The district judge further observed:

"Two experienced coal businessmen who testified for plaintiff herein indicated that coal was referred to by the vein or seam number, and not by drill holes." 371 F.Supp. at 291.

It is these two passages which the appellant coal company challenges and which, it claims, are not supported by the evidence in the record. We must agree. We have carefully examined the transcript and the exhibits received and fail to find upon the record support for these assertions. In fact, what evidence was available to the district judge clearly points to the contrary and necessitates a remand for entry of judgment in favor of the coal company.

The parties and the district court are in agreement that the latent ambiguity of the deed allowed the admission of parol evidence to "show the surrounding circumstances and what the parties intended at the time." *Alston v. Alston,* 4 Ohio App.2d 270, 212 N.E.2d 65, 69 (1964); *Accord, Sturtevant v. Hart,* 327 F.2d 695 (6th Cir. 1964); *Belcher v. Elliott,* 312 F.2d 245 (6th Cir. 1962).

The two experienced coal business men who testified for plaintiff, and who were plaintiff's sole witnesses in the trial to determine liability, were the accountant and a vice president of defendant. Their testimony, however, did not attempt to resolve the controversy of the proper description of a coal seam in conveyances. Rather their testimony indicated the tons of coal extracted by the defendant and its price on the market. No evidence was introduced by plaintiff to establish the existence of any system or practice in the conveyance of coal seams in the community during the early 1920's.[6] However, the defendant did present by deposition the testimony of one Arlo Von Gunten, who was present in Freeport Township, Harrison County, Ohio prospecting and taking up coal leases with his father from 1915 to 1936. Mr. Von Gunten testified that in this particular area of Ohio there "hap-

---

6. In opposing defendant's motion for summary judgment, plaintiff submitted an affidavit of one C. C. Fay who claimed that the more specific and common method of describing coal is by the geological name or vein number. We do not find, however, that the affidavit or the testimony of Mr. Fay was introduced into evi-

dence in the determination of the merits of the case. Nor does plaintiff contend on appeal that the affidavit constitutes evidence in support of the district court's conclusion. Cf., *U.S. v. J. B. Williams Co.,* 498 F.2d 414, 430 n. 19 (2nd Cir. 1974); *Colby v. Klune,* 178 F.2d 872 (2nd Cir.

pened to be quite a reverse or anticline"[7] which caused considerable confusion in the naming of seams. He further testified that there was only one minable seam of coal in the area and that he and his father called the seam No. 7 while the Akron Coal Company (predecessor of defendant) called the seam No. 6. However, the confusion did not exist solely between the Von Guntens and the Akron Coal Company. "It was more than that. It was confusion as far as the State Geologist was concerned. There was confusion as far as anybody who had ever drilled in there."

We think the evidence in the record compels only one conclusion. Aware of the existence of confusion over the proper denomination of the coal seam it desired, the predecessor of defendant included the more specific drill hole depths in the deed of conveyance to insure that it possessed title to the one minable seam in the area. Indeed the words of the deed expressly state that the seam is "more particularly and definitely described" by the drill hole depths.[8] The general rule is that "[w]here a deed contains two descriptions, one general and the other particular, if there is any repugnance, the particular description will prevail." 6 Thompson on Real Property § 3031, at 490–1.

In *Sturtevant v. Hart,* 327 F.2d 695 (6th Cir. 1964), we recognized that the name of a seam of coal may change through the years and approved the district court's admission of parol evidence to establish the parties' intent in reserving to the grantor the No. 12 seam. The land described in the deed contained only two veins of workable thickness: the No. 9 vein, which was conveyed to the grantee; and the vein reserved to the grantor which was then known as the No. 12 vein but later designated as the No. 14 vein. In later years the No. 12 vein was a seam of coal only five inches thick and which had no commercial value. We found the evidence more than sufficient to sustain the conclusion that the grantor intended to reserve one of the two veins of commercial value and affirmed the district court's holding that the grantor's successors owned the seam which had been known as the No. 12 seam. Similarly here we note from the undisputed evidence in the record that only one minable seam existed and thus a strong inference arises that the parties intended the conveyance of a workable seam of coal.[9] However, unlike *Sturtevant,* we also have in the deed in the instant case specific drill hold depths which locate the one minable seam intended to be conveyed. We conclude, therefore, that the parties' predecessors must have intended the conveyance of what is now known as No. 7 seam.

Reversed and remanded to the district court for entry of judgment in favor of defendant. Costs to defendant.

1949); *U.S. ex rel. Jones v. Rundle,* 453 F.2d 147 (3rd Cir. 1971).

7. "An upfold or arch of stratified rock in which the beds or layers bend downward in opposite directions from the crest or axis of the fold." Webster's Third New International Dictionary.

8. We reject the district court's reasoning that the drill hole depths in the deed were mere surplusage. Every word of description warrants the court's attention in the ascertainment of the parties' intent. *Wadsworth Coal Co. v. Silver Creek Mining and Railroad Co.,* 40 Ohio St. 559 (1884); *Gill v. Fletcher,* 74 Ohio St. 295, 78 N.E. 433 (1906); *Stocker & Sitler, Inc. v. Metzger,* 19 Ohio App.2d 135, 250 N.E.2d 269 (1969). We similarly disagree with the statement that because the drill holes were not on the grantor's land, he cannot be charged with their significance. Usually descriptions of land incorporate an extrinsic reference point. There is no contention here that the location of the drill holes was in doubt, or that the drill hole depths did not with certainty define the minable seam of coal.

9. The record discloses that the Akron Coal Company purchased the rights to the seam from plaintiff's predecessor for $4,800, certainly not an insubstantial sum of money in 1923.