Jennifer BOGGS, Administratrix, et al.

v.

BLUE DIAMOND COAL COMPANY.

Civ. No. 3–76–326.

United States District Court,
E. D. Tennessee, N. D.

Jan. 13, 1977.

Foster D. Arnett, John P. Davis, Jr., Knoxville, Tenn., Tarrant, Combs & Bullitt, Louisville, Ky., Craft, Barrett, Haynes & Ward, Hazard, Ky., for defendants.

Gerald M. Stern, George T. Frampton, Jr., Washington, D. C., J. D. Lee, Knoxville, Tenn., for all plaintiffs.

Eugene Goss, Harlan, Ky., for plaintiffs Galloway & Sparkman.

James D. Asher, Whitesburg, Ky., for plaintiff Sturgill.

## MEMORANDUM

ROBERT L. TAYLOR, District Judge.

This action was filed by fifteen widows, individually and as the personal representatives for the estates of their deceased husbands, against the Blue Diamond Coal Company (hereinafter "Blue Diamond"). Plaintiffs seek 30-million dollars compensatory damages and 30-million dollars punitive damages for the allegedly wanton, willful and malicious conduct of the defendant, which they claim was the proximate cause of the mine explosion that killed their husbands.

Blue Diamond, prior to filing an answer, has filed four motions with the Court. Oral argument was recently heard on these motions, and each party has filed lengthy briefs for the Court's consideration.

### I. *Diversity Jurisdiction*

Plaintiffs premise federal jurisdiction upon diversity of citizenship under 28 U.S.C. § 1332. Section 1332(c) reads, in pertinent part:

"(c) For the purposes of this section . . . a corporation shall be deemed a citizen of any State by which it has been incorporated and *of the State where it has its principal place of business* . . . ." (emphasis added) 28 U.S.C. § 1332(c).

Blue Diamond is incorporated in Delaware and thus, under Section 1332(c), has Delaware citizenship for the purposes of federal diversity jurisdiction. But under Section 1332(c) a corporation also has citizenship for diversity purposes in the state where its "principal place of business" is located.[1] All parties agree that Delaware is

---

1. The literal reading of the statute leads to the conclusion that a corporation's "principal place of business" can only be in one state. This "concept may get artificial in some cases . . . [where the corporation] has literally dozens of important places of business one of which we

not the principal place of business of Blue Diamond, but the parties fervently disagree on which state is the site of its principal place of business.

■ The Court notes at the outset that the burden of proving all jurisdictional prerequisites falls on the plaintiffs, since they chose to assert diversity jurisdiction. *Kaufman v. Liberty Mutual Insurance Co.,* 245 F.2d 918 (3rd Cir. 1957).

Determining the principal place of business has not proved to be an easy task for courts.[2] The Senate Report accompanying the 1958 amendment to 28 U.S.C. § 1332(c) indicates that precedents interpreting "principal place of business" in § 2 of the Bankruptcy Act should provide guidance to the courts in interpreting this phrase in Section 1332(c).

■ Plaintiffs contend that Blue Diamond's principal place of business is located in Tennessee. Thus, because thirteen of the plaintiffs are Kentucky residents and the other two plaintiffs reside in Virginia, there is a complete diversity of parties plaintiff and party defendant, as is required to invoke diversity jurisdiction.[3] Contrary to plaintiffs' contention, Blue Diamond argues that its principal place of business is located in the State of Kentucky, thus giving it Kentucky citizenship and defeating the complete diversity required under Section 1332.

An initial question, concerning which the parties have engaged in extensive debate, is whether the Court, for purposes of determining the principal place of business of Blue Diamond, should focus only on Blue Diamond, per se, or expand our analysis to include the activities and operations of all of Blue Diamond's wholly owned subsidiaries. On this question, the courts have not reached a firm resolution. Some courts, relying on precedents under the Bankruptcy Act, freely include a parent corporation's subsidiaries in determining the parent corporation's principal place of business.[4] Yet other courts have placed a heavy burden on the party attempting to aggregate the parent corporation's business with that of its subsidiary companies. *Horwat v. Paulsen-Webber Cordage Corp.,* 336 F.Supp. 1020 (W.D.Pa.1971); *Carnera v. Lancaster Chemical Corp.,* 387 F.2d 946 (3rd Cir. 1967). This burden of proof is met only when the proof establishes that the parent and subsidiary are, in effect, a "unitary enterprise."

Having reviewed the authorities and examined the record, the Court is of the opinion that it is not necessary to determine whether or not the operations of Blue Diamond's subsidiaries should be considered in determining where its principal place of business is located, because, even considering such operations, the Court finds, as a matter of fact, that Blue Diamond's principal place of business is Tennessee.

Summarizing the affidavit of the Chairman of the Board (and President) of Blue Diamond, the following factual information is deemed relevant to our inquiry. Blue Diamond, initially incorporated in Tennessee in 1915, was reincorporated as a Delaware corporation in 1922, primarily to engage in the business of mining. In recent years, Blue Diamond, for reasons unspecified, has formed wholly owned Delaware subsidiary companies and corporations to run the mining operations previously directly controlled by Blue Diamond. Since 1974,

must pick out as the principal one because the statute says so." *Kelly v. U. S. Steel Corp.,* 284 F.2d 850, 853 (3rd Cir. 1960).

2. *See, e. g.,* C. Wright, A. Miller, & E. Cooper, *Federal Practice and Procedure* § 3625 (1975).

3. The Section 1332 jurisdictional requirement that there be more than $10,000 in controversy is obviously met on these pleadings.

4. *See, e. g. Textron Electronics, Inc. v. Unholtz-Dickie Corp.,* 193 F.Supp. 456 (D.C.Conn.1961). Several scholars have commented that differ-

ent purposes are served by the Bankruptcy Act than those intended under the 1958 amendment to Section 1332, therefore the criteria used for determination of the principal place of business under each Act should include different elements consistent with those different purposes. See 1. J. Moore, *Moore's Federal Practice* ¶ 0.77[3.–4], p. 717.80 (2d ed. 1976); 13 C. Wright, A. Miller, and E. Cooper, *Federal Practice and Procedure* § 3625, pp. 788–789 (1975).

Blue Diamond has operated its coal mines solely through subsidiaries.

There are four mining subsidiaries owned by Blue Diamond:

1. Scotia Coal Company in Letcher County, Kentucky.
2. Blue Diamond Mining, Inc., in Harlan, Perry and Leslie Counties, Kentucky.
3. Stearns Mining Company, McCreary County, Kentucky.
4. Harris Mining Company, Avery County, North Carolina (a clay and mica mine).

Blue Diamond and its subsidiaries may be reported as follows:

| Business Activity | Tenn. | Ky. | N. C. | Va. | Other |
|---|---|---|---|---|---|
| 1. Owned or leased mineral rights to coal lands. | 56,000 A. | 85,000 A. | (not given) | 2,500 A. | Illinois Michigan and Ohio contain district sales offices of Blue Diamond but no information was provided by those offices. |
| 2. Employees | 82 | 1,450 | 91 | None | |
| Payroll (7 mo. period). | * | $11,066,963 | $317,284 | None | |
| 3. Tons produced on owned or leased property. | 26,161 | 1,035,409 | (not given) | 12,826 | |
| Sales from that coal (7 mo. period). | $541,983 | $33,738,270 | $1,134,284 | $213,723 | |

Thus, it is obvious that Blue Diamond and its subsidiaries make up a large business, with major activities in at least four different states. In determining which of these states serves as the location for Blue Diamond's principal place of business, we must consider what are the appropriate criteria for such determination. As Professor Moore notes:

"[T]he question of what criteria to use in determining a corporation's principal place of business has not been uniformly resolved by the courts. The basic conflict is usually expressed in terms of whether the controlling significance should be given to the place from which the corporation's activities are directed or controlled—the nerve-center; or to the location of the actual activities and operations of the corporation. An increasing number of cases, however, have not regarded these tests as mutually exclusive and have given weight to both standards. (footnotes omitted). 1 J. Moore, *Moore's Federal Practice* ¶ 0.77[3.–1]

Our own Sixth Circuit Court of Appeals in a recent decision, *Riggs v. Island Creek Coal Co.*, 542 F.2d 339 (6th Cir. 1976), shed some light on which standard should be applied to mining companies. In *Riggs*, the district court had upheld diversity jurisdiction between an Ohio plaintiff (Riggs) and defendant Island Creek Coal Company. In so doing, the district court based its holding on what it termed "virtually unanimous" case law support for applying the "place of operations" test to a mining company rather than the "home office" test. Without determining in which of several states the "bulk" of the defendant's mining operations was located, the court found the proof that the bulk of mining operations was not in Ohio sufficient to sustain defendant's petition for removal from state court on basis of diversity jurisdiction, in spite of the fact that the defendant's home office was in Cleveland, Ohio.

Judge Engel, writing for the Sixth Circuit, agreed with the lower court's holding

* For these 82 employees, the Affidavit reveals only the payroll of nine Tennessee employees ($20,420 for the 7 months). The other 73 employees work at the corporate headquarters in Knoxville, and it can be assumed that the payroll for these officers, engineers, accountants, etc., for a 7-months period, would amount to a substantial sum.

that a mining corporation's headquarters "may not invariably govern the location of its principal place of business." Judge Engel went on to hold that since the proof had not placed the "bulk of the mining operations" in any one state, but had only established that the bulk of operations was located elsewhere than' Ohio, the defendant corporation had failed to meet the affirmative requirement of diversity jurisdiction.

The Court then commented "[i]f the 'bulk of the mining operations' were shown to be located in one state, *we could accept* the district court's conclusion that that state constituted the corporation's principal place of business." (emphasis added). 542 F.2d at 342.

Finally, Judge Engel, quoting from an earlier Sixth Circuit opinion under the Bankruptcy Act, concluded:

" 'Where a corporation has more than one mine . . . situated in different districts, its office from which supreme direction and control of the business generally is had, including the operations of the several plants, *may, and perhaps must,* be deemed the principal place of business.' *Continental Coal Corp. v. Roszelle Bros.,* 242 F. 243 (6th Cir. 1917)." (emphasis added). 542 F.2d at 342.

Thus, the *Riggs* opinion holds that determination of the principal place of business is a question of fact, and in appropriate circumstances, *e. g.* where the "*bulk* of mining operations" is proven to be in *one* state, a district court acts within acceptable standards when it holds that such state is the location of the principal place of business. But, *Riggs* does not compel a district court to determine the principal place of business of a mining corporation *solely* on the location of a majority of its mining operations. Indeed, the language quoted from the *Roszelle* opinion emphasizes the importance of the location of the home office when determining the principal place of business of a mining corporation with operations in several states.

Many factors are relevant to the determination of a corporation's principal place of business under Section 1332(c). One factor often mentioned by the commentators as worthy of judicial cognizance is the state where the corporation will be involved in litigation. On this point, we note that in the late 1960's Blue Diamond filed an antitrust action in this Court against the United Mine Workers of America (UMWA) concerning actions of the UMWA in Kentucky. While that action was not based on diversity of citizenship, and as such our holding on principal place of business was unnecessary and technically not binding on this Court, the Court did enter a Pre-Trial Order in that case which stated that: "[t]he plaintiff, Blue Diamond Coal Company, is a corporation with its principal office and place of business at Knoxville, Tennessee." (Pre-Trial Order, p. 1.) This declaration was based on identical statements contained in Blue Diamond's complaint, which was signed by reputable counsel.

While Kentucky, as Blue Diamond argues, does encompass a significant portion of Blue Diamond's activities, Kentucky is not the only state wherein Blue Diamond is substantially present. While we were not provided with amount of land owned or leased in North Carolina by Blue Diamond, we note that 91 employees, whose annual payroll is over a half-million dollars, are located there. And, assuming the seven-month figures are representative, North Carolina sales amount to almost two million dollars annually. Virginia also has some contact with Blue Diamond, although clearly not on the same level as that sustained by Kentucky, North Carolina, or Tennessee.

We note that Tennessee is more than just the nominal "headquarters" of Blue Diamond's vast holdings. Knoxville is more than a convenient location at which the Board of Directors can convene on specific, but infrequent dates, to transact perfunctory business. Knoxville, instead, is the site of Blue Diamond's control center. The corporate headquarters here houses not just one or two top executives, but all the executive offices, as well as many engineers, accountants and sales personnel, for a total of 73 employees.

Tennessee feels Blue Diamond's presence more than by the mere fact that Knoxville is host to Blue Diamond's headquarters. Fifty-six thousand acres of Tennessee's surface are controlled by Blue Diamond, some of which has been surface-mined. If the seven-month figure is representative, Blue Diamond's sales of Tennessee coal amount to about a million dollars annually. Although no dollar value was assigned to the payroll of the 73 employees, nor to the corporate assets located in Tennessee, we can assume these figures are substantial. Blue Diamond was "born" (in the corporate sense) in Tennessee, only to be later re-incorporated in Delaware. Finally, Blue Diamond used this forum, less than ten years ago, to try a very difficult case, when a Kentucky court might have been a more appropriate forum. Blue Diamond now seeks to convince the Court that it should be treated as a "stranger" in Tennessee, and therefore have available the protection of a federal court if sued by a Tennessee citizen; and as in the present case, not be considered a Tennessee resident when sued by an outsider. Blue Diamond is no stranger to citizens of this state, nor to this Court.

While the proof shows that Blue Diamond is significantly present in at least four states, with substantial operations and many employees located in three of these (Kentucky, North Carolina and Tennessee), the Court is of the opinion that Tennessee is the site of Blue Diamond's principal place of business for diversity purposes.

For the foregoing reasons, it is ORDERED that defendant's motion to dismiss the complaint for lack of diversity be, and the same hereby is, denied.

## II. *Motion to Transfer*

■ Blue Diamond has moved to transfer this action to the Eastern District of Kentucky, Pikeville Division, pursuant to 28 U.S.C. § 1404(a), which reads:

"(a) For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a).

After hearing oral arguments on this question, and reading lengthy affidavits and briefs, the Court is of the opinion that many factors favor the transfer of this case to Kentucky. The mine explosion which resulted in the deaths of plaintiffs' husbands occurred in Kentucky. Thirteen of the fifteen plaintiffs reside in Kentucky, while the other two are in Virginia. Apparently, most if not all, the witnesses as to the condition of the mine prior to the explosion are Kentucky residents. It is anticipated that many Kentucky state mine officials, as well as Federal mine officials, will be called to testify, most of whom reside in Kentucky.

Also, of much concern to this Court is the fact that substantive Kentucky law will govern this case, and a Kentucky judge would feel more comfortable with that State's laws than would this Court.

While these factors weigh heavily in favor of a transfer of this case to the Eastern District of Kentucky, one important factor weighs just as heavily against such a transfer. The record indicates that the docket of the United States District Court for the Eastern District of Kentucky is flooded with civil and criminal cases to the extent that the judges in that district cannot humanly dispose of newly filed civil cases within the foreseeable future. (Criminal cases gain statutory priority under the Speedy Trial Act.)

For this reason, the interest of justice would not be served by a transfer of this case unless an arrangement can be made with Chief Judge Moynahan of the Eastern District of Kentucky and Chief Judge Phillips of the Sixth Circuit Court of Appeals, whereby, after an appropriate time is given for discovery, the case could be tried within a reasonable time.

The Court is of the opinion this case should be transferred to the Eastern District of Kentucky, unless, after counsel have explored the situation with the appropriate judges, it becomes apparent that a

trial cannot be had in that district within a reasonable time. Counsel will report to this Court on this question not later than twenty days from the date of this Memorandum opinion.

### III. *Motion to Stay Discovery*

■ At the hearing on these motions, the Court temporarily stayed all discovery in this case, pending our ruling on the jurisdictional question. Since the Court has found proper diversity jurisdiction over this action, it is Ordered that the Court's previous order, granting a temporary stay of discovery procedures, be, and the same hereby is, withdrawn.

### IV. *Motion to Strike*

The transferee Kentucky court will be in a better position to rule on this motion and any others that might be raised, therefore, the Court refrains from action on the motion to strike.

Order accordingly.