**DETROIT, TOLEDO AND IRONTON RAILROAD COMPANY and Grand Trunk Western Railroad Company, Plaintiffs-Appellees,**

v.

**CONSOLIDATED RAIL CORPORATION, Defendant-Appellant.**

No. 82–1890.

United States Court of Appeals,
Sixth Circuit.

Argued Nov. 4, 1983.
Decided Jan. 24, 1984.

---

Nancy S. Katz, Pepper, Hamilton & Scheetz, Detroit, Mich., Barbara Mather, argued, Philadelphia, Pa., Gary D. Bullock, Dinsmore & Shohl, Cincinnati, Ohio, Charles N. Marshall, Philadelphia, Pa., for defendant-appellant.

John C. Danielson, argued, Detroit, Mich., for plaintiffs-appellees.

Before LIVELY, Chief Judge, and MERRITT and JONES, Circuit Judges.

LIVELY, Chief Judge.

The important question presented by this appeal is one of jurisdiction: Does the Interstate Commerce Commission (ICC or Commission) have primary jurisdiction over an effort by a rail carrier to be relieved of the terms of a contract with a second rail carrier which established joint rates for joint routes? The district court determined that it was not required to defer to the ICC, "in what is basically a contract dispute."

## I.

### A.

In December 1975 Consolidated Rail Corporation (Conrail) entered into identical agreements with a number of connecting railroads including the plaintiffs Detroit, Toledo and Ironton Railroad Company (DTI) and Grand Trunk Western Railroad Company (GTW). DTI and GTW have since merged and will be referred to as DTI/GTW. In each of these agreements Conrail bound itself to file tariffs adopting all joint routes, joint rates and divisions published by the bankrupt railroads which it succeeded, to the extent that such joint rates and joint routes were participated in by the other party to the agreement. Further, both parties to each contract agreed "to maintain and keep open with respect to each other all routes and channels of trade via existing junctions and gateways, unless and until otherwise authorized by the Interstate Commerce Commission (Commission)."

The present controversy began when Conrail filed a rate tariff with the ICC on October 19, 1982, to be effective November 13, 1982. This rate tariff provided for cancellation of certain joint rates with other carriers arising out of the December 1975 agreements. The railroads other than DTI/GTW which were parties to the 1975 agreements, and several shippers, filed protests with the ICC and obtained a suspension of the tariff. Rather than following this course DTI/GTW filed this action in the district court seeking an injunction against cancellation of the joint rates. The district court entered a temporary restraining order (TRO) which contained the following provisions:

THEREFORE, IT IS ORDERED that Defendant Conrail is hereby:

1) restrained from taking any action which will close the through routes or joint rates specified in the Agreements, and

2) ordered to eliminate from its notice effective on November 13, 1982 each and every provision which will curtail the rights of industries to route freight traf-

fic via Plaintiffs' existing routes and gateways, and

3) directed until further order of this Court to specifically perform each and every obligation specified in the Agreements (copies of which are appended to this order).

**B.**

In compliance with the second provision of the TRO Conrail amended the tariff to make it inapplicable to DTI/GTW. The district court conducted a hearing on the plaintiffs' motion for a preliminary injunction on November 10, 1982. After hearing testimony and receiving exhibits the district court took the matter under submission. On November 17, 1982 the district court issued a preliminary injunction which contained the same operative provisions as the previously issued TRO. In an accompanying memorandum opinion the district court stated that in this action the plaintiffs challenged Conrail's right to cancel joint routes and did not question the jurisdiction of the ICC to cancel joint rates. Concluding that an action to enjoin a breach of contract was within its jurisdiction the district court then found that the plaintiffs had established the requirements for issuance of a preliminary injunction set forth in *North Avondale Neighborhood Ass'n v. Cincinnati Metropolitan Housing Authority,* 464 F.2d 486, 488 (6th Cir.1972) (per curiam): a strong showing of probable success at trial, irreparable injury, the lack of substantial harm to others from granting the injunction, and that the injunction would be in the public interest. *Detroit, Toledo and Ironton R.R. v. Consolidated Rail Corp.,* 563 F.Supp. 22 (E.D.Mich.1982).

**II.**

**A.**

When freight is carried over the rails of two or more carriers in moving from one point to another the shipper is charged either a "joint rate" or a "combination rate." A combination rate is the sum of the individual rates charged by the carriers involved. A joint rate is one agreed to by the carriers for the entire haul, with each carrier receiving a predetermined share or "division" of the charge. Combination rates are usually higher than joint rates for the same haul. The joint rates which Conrail sought to cancel in its October 19 tariff filings provided smaller divisions to it than other joint rates between the same points. The effect of the cancellation would be that in order to ship between these points utilizing DTI/GTW a shipper would be required to pay higher combination rates. The normal result would be for the shipper to quit using the joint Conrail-DTI/GTW route and to ship instead over other routes from which Conrail received a larger division. On the basis of this economic reality the district court treated Conrail's action as a cancellation of joint routes, not joint rates. Judge Posner, writing for the Seventh Circuit Court of Appeals in *Chesapeake and Ohio Ry. Co. v. United States,* 704 F.2d 373, 376 (1983), came to the same conclusion:

... the whole point of cancellation is to divert traffic to an alternative route, and diversion implies "closure"—whether total or partial is a detail.

The district court found that, if permitted, the rate tariff filed by Conrail would violate its contractual obligation to keep open all joint routes via existing junctions.

**B.**

With this background we examine the jurisdictional issues raised by Conrail on appeal. We are helped in this case by excellent briefs from both parties. Though Conrail did not contest jurisdiction in the district court, it may do so here since subject matter jurisdiction may not be waived. *United States v. Corrick,* 298 U.S. 435, 56 S.Ct. 829, 80 L.Ed. 1263 (1935); *Riggs v. Island Creek Coal Co.,* 542 F.2d 339, 343 (6th Cir.1976). The principle of "primary jurisdiction" is involved in this case. This principle was described as follows by the Supreme Court in *Far East Conference v. United States,* 342 U.S. 570, 574–75, 72 S.Ct. 492, 494, 96 L.Ed. 576 (1952):

The Court thus applied a principle, now firmly established, that in cases raising

issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over. This is so even though the facts after they have been appraised by specialized competence serve as a premise for legal consequences to be judicially defined. Uniformity and consistency in the regulation of business entrusted to a particular agency are secured, and the limited functions of review by the judiciary are more rationally exercised, by preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure.

Further explaining this principle, the Court wrote in *United States v. Western Pacific R. Co.*, 352 U.S. 59, 63–64, 77 S.Ct. 161, 164–165, 1 L.Ed.2d 126 (1956):

> The doctrine of primary jurisdiction, like the rule requiring exhaustion of administrative remedies, is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties. "Exhaustion" applies where a claim is cognizable in the first instance by an administrative agency alone; judicial interference is withheld until the administrative process has run its course. "Primary jurisdiction," on the other hand, applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views. *General American Tank Car Corp. v. El Dorado Terminal Co.*, 308 U.S. 422, 433 [60 S.Ct. 325, 331, 84 L.Ed. 361].

After quoting the language from *Far East Conference* which we have set out above, the Court then stated:

> The doctrine of primary jurisdiction thus does "more than prescribe the mere procedural time table of the lawsuit. It is a doctrine allocating the law-making power over certain aspects" of commercial relations. "It transfers from court to agency the power to determine" some of the incidents of such relations.

*Western Pacific,* at 65, 77 S.Ct. at 165 (footnote omitted).

### III.

#### A.

Conrail argues that this is clearly a case for recognition of the primary jurisdiction of the ICC. It points out that it filed a rate tariff, not a "notice" to close routes as found by the district court. It is clear that courts are not equipped to set freight rates. As the Supreme Court wrote in *United States v. Western Pacific, supra,* at 66, 77 S.Ct. at 166:

> A tariff is not an abstraction. It embodies an analysis of the costs incurred in the transportation of a certain article and a decision as to how much should, therefore, be charged for the carriage of that article in order to produce a fair and reasonable return. Complex and technical cost-allocation and accounting problems must be solved in setting the tariff initially.

The Court has also held that "[t]he authority to determine when any particular rate should be implemented is a matter which Congress has placed squarely in the hands of the Commission." *Consolidated Rail Corporation v. National Ass'n of Recycling Industries, Inc.,* 449 U.S. 609, 612, 101 S.Ct. 775, 777, 66 L.Ed.2d 776 (1981) (per curiam) (citation omitted).

In *Burlington Northern, Inc. v. United States,* 459 U.S. 131, 103 S.Ct. 514, 74 L.Ed.2d 311 (1982), the Supreme Court granted certiorari "to clarify the allocation of authority, as between the federal courts and the Interstate Commerce Commission, to set and review rates for movement of coal by rail." *Id.* at 517. The specific question in *Burlington Northern* was whether a

court had the power to declare rates charged "unlawful" during the time the ICC was considering applications for rate revision. The answer was a resounding "no." A court order which freezes the rate charged by a railroad prior to a decision by the Commission on the question of what rate is reasonable "undermines the Commission's ability to exercise the primary jurisdiction delegated to it by Congress to insure equitable and uniform rates." *Id.* at 521. In his opinion for the Court, Chief Justice Burger reviewed a line of consistent Supreme Court decisions denying the power of federal courts to enjoin rail rates. *See Arrow Transportation Co. v. Southern R. Co.,* 372 U.S. 658, 83 S.Ct. 984, 10 L.Ed.2d 52 (1963); *United States v. SCRAP,* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); *Atchison, T. & S.F.R. Co. v. Wichita Board of Trade,* 412 U.S. 800, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973); *Consolidated Rail Corp. v. National Ass'n of Recycling Industries, Inc., supra.*

### B.

The response of DTI/GTW is twofold. They argue, first, that this case concerns routes, not rates, and it merely presents an issue of contract law for decision. The doctrine of primary jurisdiction applies only where there are complex factual issues for resolution which do not fall within the conventional experience of judges. This case can and should be decided, they assert, on familiar principles of equity and contract law and does not require the treatment of technical matters which are uniquely within the experience of the ICC. In the second place, the plaintiffs contend, whatever may have been the rule prior to the enactment of the Staggers Rail Act, under existing law the regulatory powers of the ICC have been greatly reduced and the role of the courts in disputes involving rail carriers has been expanded by that Act.

As DTI/GTW point out, both the Commission and the courts have held that the Commission has no authority to interpret or enforce contracts. In *McDuffee Motor Freight, Inc. v. United States,* 543 F.2d 1181 (6th Cir.1976), the subject of dispute between two motor carriers was an agreement to sell a portion of a trucking company's operating authority to another carrier. This court held that the ICC has no authority to enforce or interpret a contract between two carriers in such a manner as to interfere with a state court action for specific performance. *McDuffee* is different from the present case because there only the contract was in issue. The state court could decree specific performance without interfering with the Commission's performance of its role. The Commission could refuse ultimately to grant a certificate of convenience and necessity to the purchaser, but that would not nullify a decree of specific performance. Each body—the court and the Commission—could operate within its own sphere without interfering with the other.

The same analysis applies to *Watson Bros. Transportation Co. v. Jaffa,* 143 F.2d 340 (8th Cir.1944), also relied upon by DTI/GTW. In *Watson Bros.* a motor carrier agreed to lease operating rights over a portion of its truck routes. In an action for specific performance by the lessee the court held that it could compel the lessor to execute the documents required to carry out its agreement, even though the actual transfer of the operating rights was subject to approval of the Commission. The third decision relied upon by DTI/GTW, *Texas N.O.R. Co. v. Brotherhood of Railroad Trainmen,* 307 F.2d 151 (5th Cir.1962), *cert. denied,* 371 U.S. 952, 83 S.Ct. 508, 9 L.Ed.2d 500 (1963), is not germane to the question before us. That case involved an action by railroads to enjoin a strike and implicated the Railway Labor Act and the Norris-LaGuardia Act.

None of the cases cited by DTI/GTW in which the courts asserted jurisdiction has involved ratemaking or some similar function particularly suitable for administrative action. *Nader v. Allegheny Airlines,* 426 U.S. 290, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976), is not to the contrary. In concluding that the district court had jurisdiction over the plaintiff's common-law tort action the

Supreme Court specifically found that no question of the reasonableness of a rate or the reasonableness of any carrier practice was involved. *Id.* at 299–300, 96 S.Ct. at 1984–1985.

### C.

■ The rule which emerges from an examination of representative decisions is that the federal courts should decide issues related to purely commercial transactions between regulated carriers and should perform their judicial function of interpreting and enforcing contracts between such parties except when such judicial action results in interference with the functions which Congress has placed in the hands of the Commission. No case has been cited which approves action by a court which interferes with the ratemaking function of the Commission. In the present case Conrail was required to amend its tariff in compliance with the TRO. As a result the Commission could not consider the cancellation of joint rates between Conrail and DTI/GTW. However, the Commission did revise its previous suspension order and the rate tariff was put into effect as to the other contracting railroads. Thus the injunction prevented the Commission from considering the rate tariff as it applied to DTI/GTW along with its application to the other contracting railroads. The injunction had a palpable effect on the proceedings of the Commission.

### D.

One further facet of DTI/GTW's first argument should be dealt with. They cite *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 60, 102 S.Ct. 2858, 2865, 73 L.Ed.2d 598 (1982), for the proposition that only public-rights controversies may be removed from Article III courts and delegated to administrative agencies; "private-rights disputes, on the other hand, lie at the core of the historically recognized judicial power." *Id.* at 69–70, 102 S.Ct. at 2871. Of course, this argument assumes that the controversy in this case concerns private contractual rights only.

However, the entire regulatory scheme of the Interstate Commerce Act presupposes public rights in matters related to freight rates. *Northern Pipeline* describes public rights disputes which may be delegated to administrative bodies as matters arising "between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments," *Id.* at 67–68, 102 S.Ct. at 2869, *quoting Crowell v. Benson,* 285 U.S. 22, 50, 52 S.Ct. 285, 292, 76 L.Ed. 598 (1932). The plenary control of the ICC over rail rates appears clearly to bring tariff disputes within the definition of public-rights controversies. In fact, the Supreme Court illustrated its definition in *Crowell v. Benson* as follows:

> Familiar illustrations of administrative agencies created for the determination of such matters are found in connection with the exercise of the congressional power as to interstate and foreign commerce. . . .

285 U.S. at 51, 52 S.Ct. at 292. We find no constitutional barrier to application of the doctrine of primary jurisdiction in the present case.

■ Unless the Staggers Act requires a different result we believe the doctrine of primary jurisdiction required the district court to stay its hand in the present case until the ICC passed on the ratemaking issues involved. This is the conclusion reached by a different district court which denied injunctive relief to one of the other railroads which was a party to a December 1975 agreement with Conrail. After the ICC reversed its suspension order the Delaware and Hudson Railway Company sought specific performance in district court. In that action the court found nothing in the December 1975 agreement which precluded Conrail from applying to the ICC for a tariff change. It also held that the protesting railroad had an opportunity to present its views at the ICC hearing and to argue that a tariff change was tantamount to a route closing. The court concluded that the Commission has primary jurisdiction to de-

termine what rates are consistent with the public interest and whether tariffs are detrimental to the shipper and connecting carrier interests, and denied relief. *Delaware and Hudson Ry. Co. v. Consolidated Rail Corp.* (E.D.Pa. No. 82–5012, Jan. 12, 1983).

## IV.

### A.

The Staggers Rail Act of 1980, Pub.L. 96–448, 84 Stat. 1897, made profound changes in relations between the ICC and the nation's railroads. The Staggers Act reduced government regulation of railroads and concomitantly reduced the role of the ICC. Section 101(a) of the Act contains a statement of "Rail transportation policy." The first two subsections graphically illustrate the change of direction:

> In regulating the railroad industry, it is the policy of the United States Government—
>
>> (1) to allow, to the maximum extent possible, competition and the demand for services to establish reasonable rates for transportation by rail;
>>
>> (2) to minimize the need for Federal regulatory control over the rail transportation system and to require fair and expeditious regulatory decisions when regulation is required;

49 U.S.C.A. § 10101a (West pamphlet 1983).[1] This court has previously noted the changes effected by the Staggers Act in two opinions by Judge Engel. *See Cleveland-Cliffs Iron Co. v. I.C.C.*, 664 F.2d 568, 587–88 (6th Cir.1981) (The Act sought to deregulate the rail industry by allowing competition, to the extent possible, to establish reasonable rail rates); *Hanna Mining Co. v. Escanaba & Lake Superior R. Co.*, 664 F.2d 594, 598 (6th Cir.1981) (The Act "represents a major effort to reduce the authority of the Interstate Commerce Commission to set maximum reasonable rates in those situations where natural market forces are better able to determine the price of rail

transportation."). The district court relied on *Cleveland-Cliffs* in concluding that it was not required to defer to the ICC in this case, and DTI/GTW urge us to treat that decision as settling the issue of jurisdiction. The statements of purpose and effect of the Staggers Act contained in *Cleveland-Cliffs* and *Hanna Mining* are clearly correct. However, just as the court did in those cases, we are required to determine whether Congress changed the role of the Commission with respect to the particular type dispute which is involved in the present case. It is clear that the ICC was not stripped of all ratemaking power by the Staggers Act.

Both *Cleveland-Cliffs* and *Hanna Mining* concerned rate agreements between railroads and shippers. The present case concerns an agreement between two railroads. Though both of our earlier cases were decided under pre-Staggers Act law the court considered the effect of the Staggers Act on such contracts. In doing so the court examined the provisions of § 208 of the Staggers Act, 49 U.S.C.A. § 10713, which permits railroads to enter into contracts with "purchasers of rail services to provide specified services under specified rates and conditions," subject to provisions of the section. § 10713(a). Section 208 also contains a provision limiting the remedy for breach of an agreement between a railroad and a shipper entered into pursuant to its provisions:

> The exclusive remedy for any alleged breach of a contract entered into under this section shall be an action in an appropriate State court or United States district court, unless the parties otherwise agree.

49 U.S.C.A. § 10713(i)(2). This provision was determinative in *Cleveland-Cliffs* and *Hanna Mining* and led to the court's conclusion that the ICC no longer had jurisdiction to review rates based on preexisting contracts between carriers and shippers before they could be enforced in federal or state courts.

---

1. All references to codified provisions of the Staggers Rail Act will be to the West pamphlet, since official codification has not been completed.

## B.

The Staggers Act contains no equivalent to section 208 in dealing with contracts between rail carriers. However, section 217 of the Staggers Act deals with "joint rate surcharges and cancellations," and subsection (c) concerns cancellations:

(c)(1) Notwithstanding any other provision of this title, any prior agreement in effect on the effective date of the Staggers Rail Act of 1980, or any requirement of the Commission, a rail carrier may cancel the application of a joint rate to a through route in which it participates, without the concurrence of any other rail carrier that is a party to such joint rate, unless another rail carrier that participates in such through route or a shipper that has no competitive alternative to such route makes the demonstration described in paragraph (2) of this subsection.

(2) The application of a joint rate to a through route may not be canceled under this subsection if a rail carrier that participates in such through route or a shipper that has no competitive alternative to such route from an origin or destination served by such route demonstrates to the Commission that the canceling carrier's share of the revenues, under the joint rate in effect at the time the application of the joint rate is canceled, is equal to or greater than—

(A) 110 percent of the canceling carrier's variable cost of providing service over such route; or

(B) such lesser percent of the canceling carrier's variable cost as such carrier earns over a competing through route to which application of the joint rate has not been canceled, or over a competing single line route.

(3) When a complaining party is unable to make the demonstration required by paragraph (2) of this subsection, the Commission may suspend the tariff canceling the joint rate only if—

(A) a complaining carrier publishes a new rate division or a new higher lawful rate which increases the canceling

carrier's share of the revenues over such route to the amount calculated under paragraph (2)(A) or (2)(B) of this subsection, whichever is less; or

(B) a complaining carrier or shipper petitions the Commission and the Commission imposes a surcharge, in conformity with such petition, upon the joint rate which will accrue solely to the canceling carrier and which, in conjunction with the canceling carrier's division of the joint rate in effect on the date the tariff canceling the joint rate was filed, will provide the canceling carrier revenues equal to or greater than 110 percent of its variable cost of providing service over such route.

Unless a new rate, division, or surcharge described in this paragraph becomes effective within 120 days after the proposed effective date of the rate cancellation, the canceling tariff shall, nevertheless, become effective.

(4) If the demonstration described in paragraph (2) is made or a new rate, division, or surcharge described in paragraph (3) becomes effective, the tariff canceling the joint rate shall be considered by the Commission in accordance with section 10705 of this title. The existing joint rate or the new rate, division, or surcharge, shall remain in effect during the pendency of the Commission's consideration.

(5) Whenever the application of a joint rate to a through route is canceled under this subsection and a rate other than a joint rate is or has been published by the canceling carrier to apply to such route, such rate shall thereafter apply in lieu of all other rates (except joint rates subsequently agreed to by such carrier) and any through rate of which such rate is a factor shall divide as the separate factors of such rate are made.

(6) Nothing in this subsection shall be construed to limit the authority of the Commission under section 10705(a) of this title to prescribe joint rates which provide a rail carrier participating in such joint rate revenues equal to or greater

than 110 percent of its variable cost of providing service over each route to which such rate applies.

49 U.S.C.A. § 10705a(c)(1).

The pertinent legislative history is found in H.R.Cong.Rep. No. 1430, 96th Cong., 2d Sess. 110, *reprinted* in 1980 U.S.Code Cong. & Admin.News, 3978, 4110, 4142:

Subsection (c) authorizes a carrier to cancel the application of a joint rate to a particular through route subject to that rate. Another carrier participating in that route or the Commission, upon petition of a shipper having no competitive alternative to the route, may prevent the cancellation upon the same demonstration or by putting into effect the same type of new rate or division necessary to cancel a surcharge under subsection (a). When a cencellation [sic] is prevented in this manner, the Commission shall consider the canceling tariff under the provisions of existing law relative to the cancellation of joint rates. If a cancellation becomes effective, the canceling carrier may establish a local or proportional rate for that movement. Any through rate of which that local or proportional rate is a part will divide as the separate factors of the through rate are made and not by prescribed divisions.

No matter when a surcharge or cancellation is challenged under this section, the issue to be decided by the Commission is whether the surcharge or cancellation met the standards of this section at the time it was filed and not at the time it is challenged.

■ It seems clear from examination of the statute, particularly its reference to findings by the Commission with respect to a canceling carrier's variable costs, that joint rate agreements between railroads remain within the jurisdiction of the ICC and that disputes over a carrier's attempt to cancel joint rates involve considerably more than principles of equity and contract law. The right to cancel joint rates depends on a showing governed by rules of railroad cost accounting which are within the experience and expert qualifications of the Commission, not of the courts. The district court should have acknowledged that primary jurisdiction over this dispute resided in the Commission and denied the motion for a preliminary injunction. After the Commission has made the required determinations and passed on Conrail's rate tariff, its expert treatment of the facts may "serve as a premise for legal consequences to be judicially defined" by the district court. *Far East Conference v. United States, supra,* 342 U.S. at 574, 72 S.Ct. at 494.

Our disposition of the appeal makes it unnecessary to consider Conrail's argument that the prerequisites for a preliminary injunction were not established by the plaintiffs.

The judgment of the district court is reversed with directions that the preliminary injunction be dissolved. Conrail will recover its costs on appeal.