PARAMOUNT SUPPLY CO., APPELLEE AND APPELLANT, *v.* SHERLIN CORPORATION ET AL., APPELLANTS AND APPELLEES.

(Nos. 47566 and 47592—Decided June 18, 1984.)

*Mr. Otto Miller,* for Paramount Supply Co.

*Messrs. Willacy & LoPresti, Mr. Aubrey B. Willacy* and *Ms. Christine C. Covey,* for Sherlin Corp. and Harry Seton.

*Mr. Robert W. McIntyre,* for third-party defendant-appellee, James Clemens.

MARKUS, P.J. Plaintiff-seller (Paramount Corporation) filed this action against defendant-buyer (Sherlin Corporation) for an alleged breach of a sales contract. Sherlin answered, denying that it breached the contract. Additionally, Sherlin and its sole shareholder (Harry Seton) counterclaimed that Paramount and its general manager breached the contract, tortiously interfered with it, and defamed them. After the parties concluded extensive discovery, the court granted summary judgment motions which denied any relief to anyone.

Paramount, Sherlin, and Seton appeal. Each complains that the trial court erred substantively or procedurally in dismissing its claims and failing to grant its request for affirmative relief. We conclude as a matter of law that official action by the federal government prevented the parties from delivering the merchandise to its ultimate destination. However, a genuine issue of material fact remains whether Paramount had completed its contractual duties when the government rendered any further action impossible. If so, Paramount is entitled to judgment against Sherlin for Sherlin's refusal to pay the contract price.

In any event, the court properly granted summary judgment dismissing all other claims. Therefore, we reverse the summary judgment which denies Paramount any relief and remand that part of the case for trial. Otherwise, we affirm.

I

The pleadings, affidavits, depositions and supporting documents establish the following chronicle of events. In July 1980, a Kuwaiti businessman contacted Sherlin's president, Harry Seton, seeking to purchase two thousand Mack truck turbochargers. Seton, in turn, contacted the turbocharger manufacturer with an offer to purchase those parts. The manufacturer advised Seton that it did not sell automotive parts directly to purchasers and suggested that Seton contact its Ohio distributor, Paramount.

Thereafter, Sherlin and Paramount conducted negotiations for that purchase by telephone. Sherlin offered to buy, and Paramount agreed to sell, two thousand turbochargers for $311.49 each. However, the witnesses disagree whether Paramount also promised to ship those parts directly to Sherlin's customer in Kuwait in September.

Sherlin claims that Paramount agreed to comply with terms of a letter of credit which Sherlin expected to receive from its Kuwaiti customer shortly. All witnesses concur that Sherlin's payment to Paramount would be made or secured by Sherlin's partial assignment of the proceeds from that letter of credit.

On July 22, 1980, Seton sent Paramount a Sherlin purchase order which purported to memorialize Sherlin's understanding of their oral agreement. It called for two thousand turbochargers at $311.49 each "[t]o be shipped direct to customer in Kuwait from [manufacturer's] plant." It also stated: "Shipments to be made according to instructions as specified in letter of credit."

Within ten days, Paramount's salesman brought a factory representative to meet with Seton, because the manufacturer could not provide two thousand turbochargers by September. Paramount contends that their meeting produced several agreed modifications to the sale terms, including a change in the dates and place of delivery. Sherlin asserts that the dates for delivery installments was the sole change made from the original purchase order. All parties agree that the shipment date for the first five hundred turbochargers was postponed at least one month.

On August 29, Sherlin mailed Paramount a second purchase order with a revised shipment schedule for the remaining one thousand five hundred units:

"PURCHASE ORDER

"1500    #185605    Switzer Turbo

"For export shipment to Kuwait at $311.49 each.

"To be shipped from factory on:
"500 pcs.                    11-14-80
"500 pcs.                    11-28-80
"500 pcs.          '         12-12-80

"Our customer letter to be issued thirty days prior to shipping date. Union Commerce Bank of Cleveland will for-

ward to Paramount Supply our assignment of proceeds."

At approximately the same time, the bank sent Paramount a copy of Sherlin's partial assignment of the ultimate customer's initial letter of credit. A Kuwaiti correspondent bank executed that credit instrument on July 30. Sherlin executed its assignment on August 14, and the bank mailed them to Paramount on August 28. This letter of credit covered the Kuwaiti customer's purchase price from Sherlin for the first five hundred units. It exceeded Sherlin's price from Paramount for that merchandise by $26,865, which presumably represented Sherlin's profit on that part of the transaction.

This credit instrument authorized drafts for the invoice value of those goods upon presentation of described shipping documents:

"Complete set of clean 'Shipped on Board' Ocean bills of lading marked freight paid * * * evidencing shipment from U.S.A. to Kuwait C & F by steamer in transit. * * *"

The instrument also described with particularity other documentation and packing instructions for the merchandise, including markings with the Kuwaiti customer's name and "KUWAIT IN TRANSIT."

Paramount's general manager became suspicious that the turbochargers might be destined for Iran, in violation of then existing embargo laws. Seton told him that his Kuwaiti customer ultimately intended to purchase fourteen thousand of these turbochargers. He discovered that these parts were used on trucks manufactured only in the United States and Iran. Seton also told him that Sherlin exported goods to Iran prior to the Iranian embargo. Kuwait borders Iran along the Persian Gulf.

Consequently, Paramount's general manager contacted a federal customs' agent to express his concern and seek instructions. The customs' agent advised

him to proceed with the transaction while the government attempted to trace the prospective shipment.

At Paramount's direction, the manufacturer delivered the first five hundred turbochargers to Paramount's offices in Ohio for further packaging in early October. Paramount claims that Sherlin then directed it to ship the merchandise to Sherlin in care of a New Jersey packing company, for special overseas packaging. Sherlin contends that it gave Paramount delivery instructions but never changed Paramount's contractual obligation to deliver the packaged units on board the departing vessel. Both versions find support in the evidentiary materials submitted to support the various summary judgment motions.

The New Jersey packing company prepared the units for overseas shipment and delivered them to a freight forwarder at the loading dock. Sherlin's Kuwaiti customer had selected both the New Jersey packing company and the freight forwarder by communications with both of them and Sherlin. The freight forwarder prepared shipping and customs documents which described Sherlin as the shipper and Sherlin's Kuwaiti customer as the consignee.

At that point, federal customs officers intervened and refused to permit the forwarder to load the merchandise on the ship. The freight forwarder then notified Sherlin and asked it to remove the merchandise or pay demurrage. Sherlin refused to accept responsibility for the merchandise and requested Paramount to cancel its invoices to Sherlin because the items "were never received." The freight forwarder sent the New Jersey packer's bill to the Kuwaiti customer.

Eventually Paramount arranged to sell the units to a New Jersey purchaser at a significant loss from Paramount's contract price with Sherlin. In turn, Sherlin lost its profit on the sale of these five hundred turbochargers to its Kuwaiti customer, plus its profit on the remaining one thousand five hundred units. Additionally, Sherlin claims that it lost profits on a further order from the same Kuwaiti businessman for another twelve thousand of the same model turbochargers. Finally, Sherlin and Seton claim that Paramount's contact with the federal customs agent defamed them and caused their personal and business reputations to suffer.

## II

Defendants Sherlin and Seton first assign two claimed errors which challenge procedural aspects of the trial court's summary judgment rulings:

"1. The trial court abused its discretion and committed error prejudicial to appellants in granting appellee's *ex parte* motions for leave to file motions for summary judgment twenty-nine days prior to the then-scheduled trial date when the unavoidable effect thereof was to delay the day of such trial.

"2. The trial court committed error prejudicial to appellants in granting appellee's motion to strike appellants' motion for findings of fact and conclusions of law when the court had theretofore rendered judgment in general terms only, and did not indicate therein whether the several claims resolved in such judgment were decided in reliance upon competent evidence and proper application of legal principles."

The trial court had tentatively scheduled the trial to begin on February 14, 1983. On January 19, 1983, the court granted Paramount leave to file its summary judgment motions on its own claim and defendants' counterclaims. The trial court also granted Paramount's motion to postpone the trial. Defendants argue that the court abused its discretion by granting those motions.

The court exercises discretion when it grants leave to file summary judgment

motions after the cause has been set for trial. Civ. R. 56(A) and (B); cf. *Indermill v. United Savings* (1982), 5 Ohio App. 3d 243, 244. To demonstrate an abuse of that discretion, the complaining party must show that the court's order was unreasonable, arbitrary or capricious. Cf. *Lee v. Jennings Transfer Co.* (1967), 14 Ohio App. 2d 221, 223 [43 O.O.2d 452]; *Granneman v. Cincinnati St. Ry. Co.* (1941), 67 Ohio App. 536 [21 O.O. 556].

The record here indicates that Paramount engaged in lengthy adversarial discovery proceedings with a non-party governmental agency before filing its summary judgment motions. Consequently, we cannot say that the trial court abused its discretion by granting Paramount leave to file those motions. In addition, defendants have failed to demonstrate any resulting prejudice from that order. They claim that the trial was thereby delayed, but there was no trial.

Defendants next contend that they were entitled to findings of fact and conclusions of law for the summary judgment rulings. Civ. R. 52 provides in part:

"Findings of fact and conclusions of law required by this rule and by Rule 41(B)(2) are unnecessary upon all other motions including those pursuant to * * * Rule 56 [summary judgment]."

The court makes no factual findings when it grants a summary judgment motion beyond its legal conclusion that no genuine issue of material fact precludes judgment. When a trial court does not assume the role of fact finder it has no duty to issue findings of fact under Civ. R. 52. Cf. *DeHart v. Aetna Life Ins.* (July 15, 1982), Cuyahoga App. No. 42932, unreported.

Defendants' first and second assigned errors lack merit.

### III

Sherlin and Seton next dispute the court's dismissal of their claims for defamation and tortious interference with Sherlin's contract with its Kuwaiti customer:

"4. The trial court committed reversible error in granting third-party defendant/appellee's motion for summary judgment on Sherlin's third-party claim and Seton's counterclaim for defamation because the sworn proof of record established that third-party defendant's statements to the United States Customs Department are actionable, *per se,* and were made with reckless disregard as to their veracity.

"5. The trial court committed error prejudicial to appellants in granting appellee's motions for summary judgment on appellants' counterclaims for tortious contractual interference where the sworn proof of record established that Paramount wrongfully interfered with Sherlin's performance of its executory contract with Bash, under circumstances which did not render such interference privileged."

Private citizens are qualifiedly privileged to give information to proper governmental authorities for the prevention or detection of crime. *Popke v. Hoffman* (1926), 21 Ohio App. 454; Prosser, Law of Torts (4 Ed. 1971) 791, Section 115; Restatement of the Law 2d, Torts (1977) 281, Section 598. In that situation, no recovery can be made for defamation, absent a showing that the speaker was moved by actual malice. *Id.*

That privilege exists even when the informant lacks reasonable grounds for his or her suspicions. *Popke, supra.* Contrary to the defendants' argument here, the informant does not forfeit that privilege by failing to investigate whether there are reasonable grounds for his belief. *Id.* If the court finds that there is no genuine issue of fact and a jury could not reasonably find actual malice with convincing clarity, then it must enter summary judgment for the opposing party. *Bukky v. Printing Co.* (1981), 68 Ohio St. 2d 45 [22 O.O.3d 183].

Paramount and its general manager presented ample unrebutted evidence that concerns for their own civil and criminal liability prompted the communications with federal customs officers.[1]

Defendants presented no evidence that Paramount's manager was motivated by actual malice. Rather, defendants attempted to infer malice from the manager's failure to investigate his suspicions personally. Actual malice cannot be inferred solely from the informant's failure to investigate, since he had no such obligation. The trial court did not err by granting summary judgment to dismiss this counterclaim.

Sherlin also argues that it was entitled to judgment against Paramount and its general manager for tortious interference with Sherlin's resale contract. Sherlin contends that Paramount's contact with the customs officer prevented Sherlin from performing that contract with its Kuwaiti customer.

Paramount's privilege to report suspected illegal activity and to protect its own legal interests also bars this claim. Cf. Restatement of the Law 2d, Torts (1965), Section 773:

"One is privileged purposely to cause another not to perform a contract, or enter into, or continue a business relationship with a third person by in good faith asserting or threatening to protect properly a legally protected interest of his own which he believes may otherwise be impaired or destroyed by the performance of the contract or transaction."

Additionally, an action for wrongful interference with another's contract requires proof that the actor's unprivileged conduct proximately caused the contractual disruption. See *Leibovitz* v. *Central Natl. Bank* (1944), 75 Ohio App. 25, 26 [30 O.O. 288]; *Reichman* v. *Drake* (1951), 89 Ohio App. 222, 226 [45 O.O. 444]; *Battista* v. *Lebanon Trotting Assn.* (C.A.6, 1976), 538 F.2d 111.

Sherlin produced no evidence that customs officials would not have stopped the shipment if Paramount's manager had not contacted them. If the shipment was actually destined for Iran, Sherlin's contract with the Kuwaiti businessman was illegal. No action exists for tortious inference with an illegal contract. However, the court had no reason to decide that issue. The court could not grant Sherlin's summary judgment motions without some evidence

---

[1] Section 535.207, Title 31, C.F.R., provided:

"§ 535.207 Trade, shipping and service transactions.

"(a) All of the following transactions are prohibited, except as authorized by means of regulations, rulings, instructions, licenses or otherwise:

"(1) The sale, supply or other transfer, by any person subject to the jurisdiction of the United States, of any items, commodities or products, except food, medicine or supplies intended strictly for medical purposes, and donations of clothing intended to be used to relieve human suffering, from the United States, or from any foreign country, whether or not originating in the United States, either to or destined for Iran, an Iranian governmental entity in Iran, any other person or body in Iran, or any other person or body for the purposes of any enterprise carried on in Iran." (45 Fed. Reg. 24433.)

Section 535.701, Title 31, C.F.R. provides:

"(a) Attention is directed to section 206 of the International Emergency Economic Powers Act which provides in part:

"(a) A civil penalty of not to exceed $10,000 may be imposed on any person who violates any license, order, or regulation issued under this title.

"(b) Whoever willfully violates any license, order, or regulation issued under this title shall, upon conviction be fined not more than $50,000, or, if a natural person, may be imprisoned for not more than ten years, or both; and any officer, director, or agent of any corporation who knowingly participates in such violation may be punished by a like fine, imprisonment or both."

that Paramount's activities were the principal moving force for the customs department actions. Cf. *Cloud* v. *Ins. Crime Prevention Inst.* (Nov. 23, 1983), Cuyahoga App. No. 46717, unreported (same rule for malicious prosecution actions).

There was unrebutted evidence that Paramount's manager's acts were privileged and a lack of any evidence that Paramount's actions caused customs to intercede. Consequently, the court properly denied the motions by Sherlin and Seton for judgment on these claims and granted the motions by Paramount and its manager to dismiss them.

The fourth and fifth assigned errors asserted by Sherlin and Seton are overruled.

## IV

The remaining issues concern the judgments which denied Paramount and Sherlin any right to recover on their respective claims for breach of their sales contract. Sherlin contends:

"3. The trial court committed error prejudicial to appellants in granting plaintiff/appellee's motion for summary judgment on appellants' counterclaims for contractual breach where the uncontroverted sworn proof of record established that Paramount materially breached its contract with Sherlin."

On its separate appeal, Paramount's assigned errors assert:

"1. The trial court erred in granting Defendant Sherlin Corporation's motion to dismiss for summary judgment against Plaintiff's complaint for failure to state a claim upon which relief can be granted.

"2. The trial court committed error prejudicial to appellant in overruling appellant's motion for summary judgment against Sherlin Corporation when sworn proof of record clearly established that appellant had fully performed its contractual obligations."

Sherlin argues that Paramount breached its contract by failing to (a) ship the turbochargers directly from the manufacturer to Sherlin's Kuwaiti customer, (b) package those parts properly for overseas shipment, and (c) deliver those goods on board the ship at Port Newark. Conversely, Paramount claims: (a) the parties modified the contractual place of delivery, and (b) Paramount fully performed its obligations under that modified contract by delivering the goods to defendant in care of the New Jersey packager.

Both parties agreed in their pleadings that a contract between them did in fact exist. However, they dispute the terms of that contract. Sherlin contends that the first written purchase order, dated July 22, 1980, comprises the complete contractual agreement between the parties. In its trial court filings, Paramount has variously argued that the written purchase order was (a) rejected by Paramount, (b) modified by the parties, or (c) mutually rescinded and replaced with an oral agreement.

R.C. 1302.04 provides in part:

"(A)  Except as otherwise provided in this section a contract for the sale of goods for the price of five hundred dollars or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this division beyond the quantity of goods shown in such writing.

"(B)  *Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of division (A) of this section against such party unless written notice of objection to*

*its contents is given within ten days after it is received."* (Emphasis added.)

R.C. 1302.01(A)(5) defines "merchant":

" 'Merchant' means a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill."

Both parties acknowledged in their pleadings that they "deal in goods involved in the transaction," so both are "merchants" within R.C. 1302.04(B). Paramount presented no evidence that it rejected the July purchase order in writing. Consequently, that purchase order created an enforceable contract between the parties.

Consistent with the terms of that contract, Paramount promised to ship the turbochargers according to the instructions in the Kuwaiti letter of credit. That instrument provided that the shipment was "U.S.A. to Kuwait C & F by steamer in transit."

R.C. 1302.33 defines applicable requirements for this C. & F. contract:

"(B) Unless otherwise agreed and even though used only in connection with the stated price and destination, the term C.I.F. destination or its equivalent requires the seller at his own expense and risk to:

"(1) *put the goods into the possession of a carrier at the port for shipment* and obtain a negotiable bill or bills of lading covering the entire transportation to the named destination; and

"(2) *load the goods and obtain a receipt from the carrier,* which may be contained in the bill of lading, showing that the freight has been paid or provided for; and

"* * *

"(4) prepare an invoice of the goods and procure any other documents required to effect shipment or to comply with the contract; and

"(5) forward and tender with commercial promptness all the documents in due form and with any indorsement necessary to perfect the buyer's rights.

"(C) Unless otherwise agreed the term C. & F. or its equivalent has the same effect and imposes upon the seller the same obligations and risks as a C.I.F. term except the obligation as to insurance." (Emphasis added.)

Thus, Paramount was obliged to deliver the goods on board the ship, absent an oral modification of the contract or Sherlin's waiver of the C. & F. shipment term.

Paramount claimed that the parties modified those delivery terms when Seton directed Paramount to ship the goods early, to Sherlin in care of the New Jersey packager. Paramount supported that contention with deposition testimony of its own manager and various documents including a bill of lading for the parts: "Consigned to Sherlin Corporation c/o M & G Supply Packing * * * Jersey City, New Jersey."

Sherlin responds with Seton's deposition testimony which denies that he directed Paramount to ship the turbochargers to Sherlin in care of that New Jersey company. Sherlin also moved to strike Paramount's supporting documentary evidence because Paramount failed to certify the genuineness of those documents. See *Brown* v. *Insurance Co.* (1978), 63 Ohio App. 2d 87, 90.

However, R.C. 1301.08 provides:

"A document in due form purporting to be a *bill of lading,* policy or certificate of insurance, official weigher's or inspector's certificate, consular invoice, or any other document authorized or required by the contract to be issued by a third party *shall be prima facie evidence of its own authenticity and gen-*

*uineness and of the facts stated in the document by the third party.*" (Emphasis added.) See, also, Evid. R. 902(9) and (10).

Accordingly, the trial court could consider that bill of lading when it ruled on the summary judgment motions.

Customarily, reference to something "in the care of" another describes a legal relationship akin to that of ownership, tenancy or bailment. *Innis* v. *McDonald* (C.P. 1956), 77 Ohio Law Abs. 417, affirmed (App. 1956), 77 Ohio Law Abs. 424; cf. *River Services Co.* v. *Hartford Acc. & Indemn. Co.* (N.D. Ohio 1977), 449 F. Supp 622. Thus, delivery to B at the proper place discharges the deliverer's liability, when a package is addressed to "A, in care of B." Cf. *Ela* v. *American Merchants' Union Express Co.* (1872), 29 Wis. 611, 9 Am. Rep. 619.

R.C. 1302.12 provides:

"(A) An agreement modifying a contract within sections 1302.01 to 1302.98, inclusive, of the Revised Code, needs no consideration to be binding.

"(B) A signed agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or rescinded, but except as between merchants such a requirement on a form supplied by the merchant must be separately signed by the other party.

"(C) The requirements of section 1302.04 of the Revised Code, must be satisfied if the contract as modified is within its provisions.

"(D) Although an attempt at modification or rescission does not satisfy the requirements of division (B) or (C) of this section, it can operate as a waiver.

"(E) A party who has made a waiver affecting an executory portion of the contract may retract the waiver by reasonable notification received by the other party that strict performance will be required of any term waived, unless the retraction would be unjust in view of a material change of position in reliance on the waiver."

Thus, subsequent acts and agreements may modify or operate as a waiver of commercial sales contract terms. Cf. *Morrison* v. *Devore Trucking, Inc.* (1980), 68 Ohio App. 2d 140 [22 O.O.3d 252].

If Sherlin directed delivery to itself in New Jersey, then Sherlin waived all contrary delivery terms in any previous version of their contract. Therefore, Paramount fully performed its contractual obligations, if Sherlin waived delivery on board the ship and demanded delivery to itself in New Jersey. R.C. 1302.12(D). There is a genuine issue concerning this material fact which precludes summary judgment for or against Paramount on its claim. Cf. *Gerwin* v. *Clark* (1977), 50 Ohio App. 2d 331 [4 O.O.3d 283]; *Steuber Co.* v. *Hercules Inc.* (C.A. 5, 1981), 646 F.2d 1093, 1097.

By contrast, the court properly granted summary judgment dismissing Sherlin's claim for breach of their contract, regardless of whether Paramount fully performed. Obviously, Paramount did not breach its contract if it properly tendered delivery of the goods. R.C. 1302.51. Further, the government's intervention prevented Paramount from accomplishing delivery aboard ship if Paramount had that contractual duty.

That governmental action discharged any obligation which it precluded under the doctrine of impossibility of performance. R.C. 1302.73. Cf. *West Los Angeles Inst.* v. *Mayer* (C.A.9, 1966), 366 F.2d 220, 223; *Lowenschuss* v. *Kane* (S.D.N.Y. 1973), 367 F. Supp. 911. Sherlin's express or implied consent to any earlier deviations from the contract terms clearly waived its claim that they constituted a breach. Moreover, no earlier deviation proximately caused Sherlin to sustain any damage.

Accordingly, Paramount's first assigned error has merit. Paramount's second assigned error and Sherlin's third assigned error lack merit. In case No. 47592, we reverse the trial court's

summary judgment denying Paramount's claim for breach of its sales contract. Otherwise, we affirm all other aspects of the trial court's judgment challenged in case Nos. 47566 and 47592.

This cause is affirmed in part, but reversed with respect to the summary judgment which denies Paramount any relief, and that part of the case is remanded to the common pleas court for trial.

*Judgment accordingly.*

JACKSON and NAHRA, JJ., concur.