**GASTON DRUGS, INC., et al., Plaintiffs,**

v.

**METROPOLITAN LIFE INSURANCE COMPANY, Defendant.**

**No. C–3–85–402.**

United States District Court, S.D. Ohio, W.D.

July 1, 1986.

Eugene F. McShane, Alan C. Witten, Columbus, Ohio, for plaintiffs.

Stephen M. O'Bryan, Cleveland, Ohio, for intervening plaintiff.

David E. Beitzel, Dayton, Ohio, William J. Toppeta, John L. Viola, New York City, for defendant.

DECISION AND ENTRY OVERRULING PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION (DOC. # 25 AND # 26); FINDINGS OF FACT AND CONCLUSIONS OF LAW; ENTRY SETTING CONFERENCE CALL

RICE, District Judge.

This case is before the Court on Plaintiffs' Motions for a Preliminary Injunction (Doc. # 25 and # 26), which seek an order from this Court temporarily enjoining the Defendant from auditing Ohio pharmacies participating in the Defendant's MediMET prescription drug insurance program and from terminating or threatening to terminate pharmacies refusing to repay alleged overpayments. A hearing in this matter was held before this Court on February 20, 1986. For the reasons set forth in the Court's Findings of Fact, Conclusions of Law and Discussion, Plaintiffs' Motion is hereby overruled.

I. *Findings of Fact*

(1) Plaintiff Martin James Mullaney operates two pharmacies, dba Mullaney's Prescription Pharmacy and Mullaney's Blue Ash Pharmacy, in Cincinnati. (Tr. 8).

(2) Plaintiff-Intervenor, Hanson Drug Service, Inc., operates seven pharmacies, dba Aid-N-Save Pharmacies, throughout the northeastern area of Ohio, in the counties of Trumbell County, Lake County, Columbiana County and Ashtabula County, and whose principal place of business is in Newton Falls, Ohio. (Tr. 38; Hanson's Exh. 12).

(3) Defendant, Metropolitan Life Insurance Company, is an insurance company whose corporate headquarters is in New York City, New York. (Tr. 108).

(4) In 1969, General Motors, based upon a collective bargaining agreement between it and the United Auto Workers, retained the services of Metropolitan Life Insurance Company to administer a prescription drug plan. The program known as "MediMET" was established to provide the bargained-for benefits. (Tr. 98).

(5) Subsequently, other employers followed the lead of General Motors and contracted with Metropolitan for MediMET prescription drug coverage. (Tr. 98–99).

(6) In all cases, the terms of MediMET coverage are determined by the employers and the applicable collective bargaining units. (Tr. 98).

(7) Metropolitan has entered into agreements, known as the MediMET Agreements, with approximately 30,000 pharmacies throughout the nation, including those within the State of Ohio. (Tr. 102).

(8) Under a typical MediMET plan, a prescription for a covered drug is submitted by the patient to a pharmacist participating in the MediMET Program ("participating provider") along with an identification card identifying the patient as eligible to receive benefits under the Program. The patient pays a small co-payment, or deductible, and the participating provider fills the prescription and bills Metropolitan via a universal claim form or via electronic means for payment under the terms of the MediMET Agreement. (Tr. 99).

(9) To participate in the MediMET program, participating providers request that Metropolitan execute a MediMET Prescription Drug Agreement (the "MediMET Agreement"). The terms of the Agreement are non-negotiable and participating providers voluntarily enter into the Agreement in order to service patients who might be eligible for benefits under the Program. (Tr. 9 & 79).

(10) Plaintiff Mullaney has entered into a MediMET Agreement with Metropolitan for both of his pharmacies. (Tr. 8).

(11) Hanson and Metropolitan have entered into MediMET Agreements for all seven of Hanson's pharmacies. (Tr. 42).

(12) The terms of Plaintiff Mullaney and Plaintiff-Intervenor Hanson's MediMET Agreements with Metropolitan are identical. (*Compare* Plaintiff's Exh. 1 *with* Hanson Exh. 1).

(13) The MediMET Agreement contains the following payment provision:

Metropolitan will pay Participating Provider an amount determined in accordance with Item F of the Schedule for Covered Drugs dispensed to Eligible Persons less the applicable co-payment amount set forth in Item D of the Schedule which co-payment amount is payable by the Eligible Person for each prescription or refill.

(Plaintiff's Exh. 1 at ¶ 3).

(14) Each Schedule for Covered Drugs is determined between Metropolitan and the employer who has agreed to provide MediMET coverage for its employees. The terms of the Schedules vary slightly, but Item F, which provides the terms of payment to participating pharmacists, in all Schedules, except that for General Electric, bases payment on "Acquisition Cost Plus Dispensing Fee." (Hanson Exh. 1 at C–K).

(15) The MediMET Agreement contains the following definition:

"Acquisition Cost" means the actual cost of a Covered Drug to Participating Provider as determined by Metropolitan, including trade and volume discounts and other allowances.

(Plaintiff's Exh. 1 at ¶ 1(e)).

(16) The MediMET Agreement contains the following provision regarding inspection of records:

Metropolitan or its duly authorized agents shall have the right at reasonable intervals and during regular business hours of Participating Provider to review such business records and prescription files of Participating Provider as Metropolitan or its duly authorized agents deem necessary to assure compliance with the terms of this Agreement.

(*Id.* at ¶ 10).

(17) The MediMET Agreement contains the following termination provision:

This Agreement shall remain in full force and effect until terminated by either party effective upon at least thirty (30) days written notice to the other, except that Metropolitan reserves the right to terminate, effective upon written notice by Participating Provider, for violation of this Agreement or for other good cause.

(*Id.* at ¶ 11).

(18) The MediMET Agreement provides that it cannot be amended except in a writing signed by both parties:

This Agreement ... constitutes the entire understanding between the parties and shall not be altered or amended except in writing signed by both Metropolitan and Participating Provider.

(*Id.* at ¶ 14).

(19) Upon presenting a prescription to a participating provider, patients covered under the MediMET Program sign a "Universal Claim Form" in which they agree to release information pertaining to the claim to Metropolitan. The participating provider then inserts information into the "Universal Claim Form" regarding the drugs dispensed and the cost of the drugs and, unless it participates in a tape-to-tape program, submits a copy of the form to Metropolitan for payment. A tape-to-tape program is a system that allows a participating pharmacy to send Metropolitan its claims in a form directly readable by Metropolitan's computer. (Defendant's Exh. B; Tr. 99, 101).

(20) Plaintiff Mullaney admitted that he does not indicate his actual acquisition cost of the drugs on the form, but rather that he indicates the "Average Wholesale Price" of such drugs. According to Mullaney, the price he submits to Metropolitan—Average Wholesale Price—is often not the actual cost he incurred. (Tr. 32).

(21) Plaintiff Hanson also admitted that Hanson also submits claims to Metropolitan at Average Wholesale Price, rather than at actual acquisition cost. (Tr. 47, 48, 51–52, 63, 75).

(22) In 1982, Metropolitan encouraged providers to submit claims on a tape-to-tape basis, but in doing so made no statement regarding submission of claims at Average Wholesale Price. (Hanson Exh. 2).

(23) Plaintiff-Intervenor Hanson contracted with Quadax to send its claims to Metropolitan on a tape-to-tape basis. The

letters from Quadax to Metropolitan indicating that Hanson's claims would be submitted on a tape-to-tape basis contain no indication that claims would be submitted at Average Wholesale Price rather than at acquisition cost. (Tr. 43–47; Hanson Exh. 3).

(24) Metropolitan has audited a number of Ohio pharmacies under the provisions of the Agreements since the beginning of the MediMET program. (Tr. 103–105).

(25) In 1975, Metropolitan audited one of the pharmacies operated by Plaintiff-Intervenor Hanson, found overpayments, and reached a settlement with Hanson concerning the overpayments. (Tr. 49 & 85).

(26) On January 7, 1985, Plaintiff Mullaney's pharmacies were audited by Metropolitan. Subsequently, Mr. Mullaney received a bill indicating an overpayment of around $8,000, and three weeks later a letter indicating payment for future claims would be withheld unless the alleged overpayment was repaid. (Tr. 20–21).

(27) On July 16 and 17, 1985, Metropolitan conducted an audit of Plaintiff-Intervenor Hanson's pharmaceutical records. On August 9, 1985, Metropolitan demanded Hanson repay $76,975.33 in alleged overpayments. Hanson refused to pay. (Hanson Exh. 4 & 5; Tr. 52).

(28) On October 22, 1985, Metropolitan sent a letter to Hanson threatening termination of the MediMET Agreement if Hanson did not pay $76,975.33. (Hanson Exh. 5).

(29) On November 25, 1985, Metropolitan gave notice to Hanson that it would terminate the MediMET Agreement in thirty days. (Tr. 53; Hanson Exh. 9).

## II. *Discussion*

This case arises out of Defendant Metropolitan Life Insurance Company's audits of certain Ohio pharmacies for overpayments under a prescription drug supply agreement (the MediMET Agreements), and the Defendant's subsequent attempts to collect for overpayments found by the audits. Plaintiffs and Plaintiff-Intervenors (hereinafter collectively referred to as "Plaintiffs") claim that these audits are barred by Ohio statute and by the terms of the MediMET Agreements. Accordingly, Plaintiffs argue that Defendant's threats to terminate pharmacies that refuse to either refund overpayments or sign a new supply agreement, (Defendants Exh. C), which contains new cost calculation terms, are made in bad faith and are not within Defendant's contractual rights. Defendant claims that its audits, its overpayment calculations and its threats of termination are entirely within its rights under the contracts. Before discussing these arguments specifically, the Court must review the standards for determining whether preliminary injunctive relief is appropriate.

Four criteria must be met for preliminary injunctive relief to be appropriate:

(1) A strong showing of a probability of success at trial on the merits;

(2) irreparable injury;

(3) the lack of substantial harm to others from granting of the injunction; and

(4) the public interest in the granting of the injunction.

*See, e.g., Detroit, Toledo & Ironton Railroad Co. v. Consolidated Rail Corp.,* 727 F.2d 1391, 1393 (6th Cir.1984). This discussion will consider whether Plaintiffs have made a showing of probable success at trial on their claims either under the Ohio statute governing disclosure of pharmacy records or under the terms of the MediMET Agreement.

### A. *O.R.C. § 3719.13*

The statute governing disclosure of pharmacy records is found at O.R.C. § 3719.13:

Inspection of prescriptions, orders, records, and stock.

Prescriptions, orders, and records, required by Chapter 3719, of the Revised Code, and stocks of dangerous drugs and controlled substances, shall be open for inspection only to federal, state, county, and municipal officers, and employees of the state board of pharmacy whose duty it is to enforce the laws of this state or of the United States relating to con-

trolled substances. No person having knowledge of any such prescription, order, or record shall divulge such knowledge, except in connection with a prosecution or proceeding in court or before a licensing or registration board or officer, to which prosecution or proceeding the person to whom such prescriptions, orders, or records relate is a party.

Plaintiffs would have the Court construe the statute broadly to preclude audits of their drug purchase and prescription records. Upon review of the statute, Ohio Administrative Code § 4729-5 and the record of the hearing on Plaintiffs' Motion for a Preliminary Injunction, the Court must reject this broad construction of the statute, and conclude that Plaintiffs have failed to demonstrate a strong probability of success on their claims for relief under this statute.

■ Initially, the Court notes that Defendants attempt to define "dangerous drug" narrowly must be rejected. Ohio Administrative Code § 4729-5-11 defines "dangerous drug" as "any drug or drug product the commercial package of which bears a label containing the legend 'Caution: Federal Law Prohibits Dispensing Without Prescription' ... or any similiar [sic] restrictive statement." Thus, all prescription drugs are covered by O.R.C. § 3719.13, notwithstanding any testimony of Joseph Garczewski to the contrary. (*See* Tr. 130).

■ The Court, however, must conclude that O.R.C. § 3719.13 does not bar disclosure of the types of information sought by Defendant in its audits. Plaintiffs have not argued that the information disclosed to Defendant by the pharmacies on the Universal Claim Forms (Defendant's Exh. B) is barred by the statute.[1] This claim form includes information regarding the cardholder and recipient's name, the pharmacy name, the prescription numbers, the

national drug code numbers for drugs provided and the quantity of drugs provided. Tr. 76. Plaintiffs have failed to show that any prescription information is sought by the Defendant in its audits that has not already been revealed by the Universal Claim Forms. Furthermore, the Court can find no basis for construing the statute to protect a pharmacy's *purchasing* records— the administrative regulations interpreting the statutes apply the disclosure limits only to *dispensing* (prescription) information. *See* Ohio Admin. Code § 4729-5-17. Plaintiffs have failed to show that the material Defendant has sought in its audits are of the type protected by the statute, and thus the Court must conclude that they have failed to make a showing of a probability of success on their claim under O.R.C. § 3719.13.

■ In addition, the Court notes that Plaintiffs have failed to show that the waiver signed by all MediMET users on the Universal Claim Form would not bar a prosecution of a pharmacy under O.R.C. § 3719.13. That release specifically provides: "I authorize release of all information pertaining to this claim to the plan administrator, underwriter, sponsor, policymaker and the employer." Defendant's Exh. B. In light of such a release, the Court finds Plaintiffs need to make at least some showing of a probability of actual prosecution under the statute to meet their burden of showing a strong probability of success at trial on the merits. No such showing was made at the hearing in this matter. The Court, therefore, finds that the release portion of the Universal Claim Forms provides an independent, alternative ground for rejecting Plaintiffs' request for injunctive relief on the basis of O.R.C. § 3719.13.[2]

## B. *Contract Rights*

Plaintiffs also argue that Defendant's audits, overpayment calculations and

---

**1.** Indeed, since the Plaintiffs routinely participate in this disclosure of information, such an argument would effectively bar injunctive relief under the "unclean hands" doctrine.

**2.** The parties have not addressed, and so the Court at present need not consider, the issue of whether O.R.C. § 3719.13, as it applies to administrators of employee benefit plans, is preempted by the Employee Retirement Income Security Act of 1974 (ERISA).

threats to terminate Plaintiffs are violations of their rights under the MediMET Prescription Drug Agreement (Plaintiff's Exh. 1 and Hanson Exh. 1). Three paragraphs of this contract are relevant to this argument:

(3) Provider Payment

Metropolitan will pay Participating Provider an amount determined in accordance with Item F of the Schedule for Covered Drugs dispensed to Eligible Persons less the applicable co-payment amount set forth in Item D of the Schedule which co-payment amount is payable by the Eligible Person for each Prescription Order or refill.

(10) Inspection of Records.

Metropolitan or its duly authorized agents shall have the right at reasonable intervals and during regular business hours of Participating Provider to review such business records and prescription files of Participating Provider as Metropolitan or its duly authorized agents deem necessary to assure compliance with the terms of this agreement.

(11) Term of Agreement—Termination. This agreement shall remain in full force and effect until terminated by either party effective upon at least thirty (30) days written notice to the other, except that Metropolitan reserves the right to terminate, effective upon receipt of written notice by Participating Provider, for violation of this Agreement or for other good cause.

On their face, these contractual provisions appear to give Defendant the power to engage in precisely the forms of conduct Plaintiffs claim entitle them to injunctive relief. Paragraph ten seems plainly to permit Defendant to audit the Plaintiff pharmacies. Paragraph three provides for payment in accordance with Item F of the

Schedule for Covered Drugs of a particular plan. While each plan varies slightly in its terms, most Item F terms provide for "Acquisition Cost Plus Dispensing Fee." [3] *See, e.g.,* Hanson Exh. 1 at D–K. "Acquisition cost," in the MediMET Agreement, is defined as "the actual cost of a Covered Drug to Participating Provider as determined by Metropolitan, including trade and volume discounts and other allowances." Plaintiff's Exh. 1 at ¶ 1(e). Finally, paragraph eleven seems to give Defendant (or Plaintiffs) the power to terminate the contract without cause if thirty days notice is given.

Plaintiffs argue, however, that Defendants' monthly "Summary Statement of Benefit" amounted to Metropolitan's determination of what acquisition costs were, and, thus, that Defendant was barred for "redetermining" acquisition costs by means of an audit. Plaintiffs point to O.R.C. § 1302.11 (U.C.C. 2–208) to support this argument.

O.R.C. § 1302.11 provides:

Course of performance or practical construction.

(A) Where the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement.

(B) The express terms of the agreement and any such course of performance, as well as any course of dealing and usage of trade, shall be construed whenever reasonable as consistent with each other; but when such construction is unreasonable, express terms shall control course of performance and course of performance shall control both course of dealing and usage of trade.

---

**3.** At least one Drug Schedule (Hanson Exh. 1 at C) provides for payment of "lowest retail price being charged at time Rx dispensed, including any available discounts." However, based upon the testimony at the hearing in this case and upon the parties' post-hearing briefs, the Court must conclude that it is the payment term "Acquisition Cost plus Dispensing Fee" that is in dispute in this litigation.

(C) Subject to the provisions of section 1302.12 of the Revised Code, such course of performance shall be relevant to show a waiver or modification of any term inconsistent with such course of performance.[4]

Plaintiffs argue that under subsection (A), Defendants' Summary Statements of Benefit, which are calculated according to the Average Wholesale Cost of the drugs sold, indicate a course of performance equating acquisition cost with average wholesale cost. However, under subsection (B) of O.R.C. § 1302.11, unless a course of performance can reasonably be construed as consistent with the express terms of a contract, "express terms shall control course of performance...." *See also* E. Farnsworth, *Contracts* § 7.13 (1982) ("In case of conflict, the provisions of the agreement prevail over course of performance....").

In the present case, even assuming *arguendo* that Plaintiffs have shown that by the course of performance, the average wholesale cost of the drugs was used as the price term in the contract between Plaintiffs and Defendant, the Court finds that "average wholesale price" and "acquisition cost" cannot reasonably be construed as consistent. The testimony at the hearing plainly showed that average wholesale price is not determined by the price that a particular pharmacist pays a particular drug company for a specific batch of a drug. As Mr. Mullaney testified:

Q: Well, the AWP [Average Wholesale Price] is rarely the actual cost incurred, is it?

. . . . .

A: Rarely the actual cost? I suppose it's rarely the actual cost. It can be sometimes, it cannot be other times. It may be higher, it may be lower.

Tr. 32. "Acquisition Cost" under the express terms of the MediMET Agreement, simply must be the actual cost of acquiring the drug. The testimony reveals average wholesale price has *nothing* do do with a particular pharmacist's cost of acquiring a particular drug. The Court must, therefore, find that the terms "average wholesale price" and "acquisition cost" cannot be reasonably construed as consistent, and accordingly the Court must conclude that the express price term of the contract, acquisition cost, controls over the alleged course of performance payment policy.

■ Nor can the Court find that the course of performance in the relationship between Defendant and the various Plaintiffs has caused a modification or waiver of Defendant's contractual rights. O.R.C. § 1302.12(B) (U.C.C. 2–209(B)) provides:

A signed agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or rescinded, but except as between merchants such a requirement on a form supplied by the merchant must be separately signed by the other party.

In the present case, the contract plainly provides that it can only be modified by a writing signed by both parties. *See* Plaintiff Exh. 1, ¶ 14.

■ Further, while acts subsequent to an agreement can cause a waiver of that agreement, *see* O.R.C. § 1302.12(D) (U.C.C. 2–209(D)); *Paramount Supply Co. v. Sherlin Corp.*, 16 Ohio App.3d 176, 184, 475 N.E.2d 197, 206 (1984), the Plaintiffs have failed to show any commercial practice by Defendant amounting to a waiver of the "acquisition cost" term of the Drug Schedules as incorporated into the contract by paragraph three. Mr. Mullaney, owner of two Plaintiff pharmacies in Cincinnati, nowhere testified that Defendant's course of performance had led him to conclude that the Defendant had waived the contractual term "acquisition cost" in favor of "average wholesale price" in its final payment determinations. (Tr. at 8–37). The Court cannot find a strong probability of success on the merits of a waiver theory

---

**4.** The Court will assume *arguendo* that the transactions here are sales of goods, and accordingly that Article Two of Ohio's Uniform Commercial Code should apply. As a practical matter, it is not clear that the law of course of performance and modification is any different for non-sale of goods contracts. *See* E. Farnsworth, *Contracts* § 7.13 (1982).

absent testimony by Plaintiffs' witness that the course of Defendant's performance led him to believe the express term of the contract was waived. *Cf. Paramount Supply Co.*, 16 Ohio App.3d at 184, 475 N.E.2d at 206 (*direct* instructions contrary to terms of contract can create waiver). Furthermore, the uncontroverted testimony of Thomas R. Batters, the MediMET program director, indicates that the Defendant had an ongoing auditing program used to determine overpayments because of charges made on the basis of average wholesale price rather than acquisition cost. Tr. at 103–04. Plaintiff-Intervenor's own witness, Joseph Garczewski, testified that one of the Hanson pharmacies had been audited in 1975, and Hanson had paid the Defendant an amount in settlement of overpayment. Tr. at 49 and 85. Based upon such evidence, the Court must conclude that Plaintiffs have failed to show a strong probability of success on the theory that Defendant's course of performance constituted a waiver of the Agreement's acquisition cost term of payment.

█ Finally, the Plaintiff-Intervenor Hanson argues that its switch to a tape-to-tape reimbursement policy in August, 1983 (*see* Hanson Exh. 10, Affidavit of James F. McCaulley at ¶ 3) constituted permission by Defendant to calculate drug costs according to average wholesale price rather than acquisition cost. The Plaintiff-Intervenor, however, has failed to show any agreement by Defendant allowing use of average wholesale price for pharmacies reporting claims tape-to-tape. Indeed, the letter of Gary J. Sekulski (Hanson Exh. 2) which informs participating pharmacies that they can use the tape-to-tape reporting method makes no mention of permitting the use of average wholesale price in place of acquisition cost. The bare assertion that Quadax, the company providing tape-to-tape service to Hanson, needed to use average wholesale price in its reporting process does not indicate that the Defendant has modified the Agreement's express terms. The Court, therefore, concludes that the use of tape-to-tape recording by the Plaintiff-Intervenor has not been shown to affect the express price term of the MediMET Agreement.

Since the Court has found that the Plaintiffs have not shown (even assuming *arguendo* that this case is controlled by Article Two of Ohio's Uniform Commercial Code) that the express terms of the contracts between Plaintiffs and the Defendant, the probability of success on the merits of Plaintiffs' causes of action against Defendant must be evaluated in light of the express terms of the MediMET Agreement. As the Court has previously noted, the express terms of the Agreement set the price Defendant must pay participating pharmacies at actual acquisition cost plus a dispensing fee. The Agreement also provides Defendant with the right to audit Plaintiffs' pharmacies, and with the right to terminate the Agreement without cause provided thirty day notice is given. Plaintiffs have not shown that the Defendant has acted beyond the scope of these contractual rights, and thus have not shown a strong probability of success on the merits of its claim under the terms of the Medi-MET Agreement.

### III. *Conclusions of Law.*

(1) Ohio Revised Code § 3719.13 contains the following provision:

> Prescriptions, orders, and records, required by Chapter 3719, of the Revised Code, and stocks of dangerous drugs and controlled substances, shall be open for inspection only to federal, state, county, and municipal officers, and employees of the state board of pharmacy whose duty it is to enforce the laws of this state or of the United States relating to controlled substances. No person having knowledge of any such prescription, order, or record shall divulge such knowledge, except in connection with a prosecution or proceeding in court or before a licensing or registration board or officer, to which prosecution or proceeding the person to whom such prescription, orders, or records relate is a party.

(2) "Dangerous Drug" as used in O.R.C. § 3719.13 includes all prescription drugs. Ohio Admin. Code § 4729–5–11.

(3) Plaintiffs have failed to demonstrate that the audits conducted by Metropolitan violate the prohibitions of disclosure of prescription information under O.R.C. § 3719.-13 and its administrative interpretation, Ohio Admin. Code § 4729–5–13.

(4) Plaintiffs have failed to demonstrate that the release clause of the Universal Claims Form would not allow disclosure of the information sought by Metropolitan in its audits.

(5) The MediMET Agreement constitutes a contract between Metropolitan and the respective participating pharmacies. The terms of this contract are supplemented by various Schedules of Covered Drugs.

(6) The MediMET Agreement, supplemented by Schedules of Covered Drugs, provides for payment by Metropolitan to participating pharmacies at acquisition cost plus dispensing fee. (Hanson Exh. 1 at D–K).

(7) Acquisition cost means "the actual cost of a Covered Drug" to a pharmacy, "as determined by Metropolitan, including trade and volume discounts and other allowances." (Plaintiff's Exh. 1 at ¶ 1(e)).

(8) Average Wholesale Price cannot reasonably be construed as consistent with Acquisition Cost as set forth in the express terms of the MediMET Agreement. (O.R.C. § 1302.11(B)).

(9) Any modification of the MediMET Agreement must be in writing. (Plaintiff's Exh. 1; O.R.C. § 1302.12(B)).

(10) Plaintiffs have failed to show that Metropolitan has, by its Summary Statements of Benefits, waived its contractual power to determine Acquisition Cost. (O.R.C. § 1302.12(D); *Paramount Supply Co. v. Sherlin Corp.*, 16 Ohio App.3d 176, 184, 475 N.E.2d 197, 206 (1984)).

(11) Metropolitan is contractually entitled to audit Plaintiffs' pharmacies, and to determine Acquisition Costs. (Plaintiff's Exh. 1 at ¶ 10).

(12) Metropolitan is entitled to terminate the MediMET Agreement without cause by providing thirty days notice to Plaintiffs or other participating pharmacies, or to terminate upon receipt of written notice for violation of the Agreement or other good cause. (*Id.* at ¶ 11).

(13) Over-reporting of Acquisition Cost by Plaintiffs would constitute a violation of the Agreement.

(14) Plaintiffs have failed to show that Metropolitan's audits violated the terms of the MediMET Agreement.

(15) Plaintiffs have failed to show that Metropolitan's demands for repayment of overpayments violates the terms of the MediMET Agreement.

(16) Plaintiffs have failed to show that Metropolitan's threat to terminate Plaintiff-Intervenor Hanson's MediMET Agreement violates the terms at that Agreement.

(17) Plaintiffs have failed to show a strong probability of success on the merits of their claim for relief, a requisite element of preliminary injunctive relief, and thus Plaintiffs have failed to establish their entitlement to preliminary injunctive relief.[5]

Accordingly, Plaintiffs' Motion for Preliminary Injunction (Doc. # 25 & # 26) are overruled.

## IV. *Further Procedures*

A telephone conference is hereby set between the Court and counsel for Friday, July 11, 1986, at 5 p.m. for the purpose of resolving Defendants' Motions to Compel Discovery (Doc. # 57 & # 58), and to discuss Plaintiffs' Motions for Sanctions (Doc. # 38) and to Certify Class (Doc. # 35). A new trial date will also be set at this conference.

---

**5.** Because Plaintiffs have failed to establish a strong probability of success at trial on the merits of their claims, the Court need not consider the other three criteria for a preliminary injunction.