GASTON DRUGS, INC.; Martin James Mullaney d/b/a Mullaney's Prescription Pharmacy and Mullaney's Blue Ash Prescription Pharmacy, Plaintiffs-Appellants,

v.

METROPOLITAN LIFE INSURANCE COMPANY, Defendant-Appellee.

No. 86–3658.

United States Court of Appeals, Sixth Circuit.

Argued May 14, 1987.

Decided July 22, 1987.

---

Eugene F. McShane, Alan C. Witten, argued, Columbus, Ohio, for plaintiffs-appellants.

David E. Beitzel, Altick & Cowin, Dayton, Ohio, William J. Toppeta, John L. Viola, argued, New York City, for defendant-appellee.

Before JONES and RYAN, Circuit Judges; and CELEBREZZE, Senior Circuit Judge.

PER CURIAM.

Plaintiffs appeal from the district court's order denying their motion for a preliminary injunction to enjoin defendant Metropolitan Life Insurance Company ("Metropolitan") from auditing plaintiffs' records, 653 F.Supp. 1104. Finding no error in the district court's disposition of the case, we affirm.

Plaintiffs in this action are Gaston Drugs, Inc. ("Gaston"), an Ohio pharmacy, and Martin James Mullaney, the owner of two other pharmacies, all licensed to sell and dispense prescription drugs in Ohio. Gaston and Mullaney brought suit on their own behalf and on behalf of a proposed class consisting of other pharmacies in Ohio that are participants in the MediMET prescription drug program. After the suit had been filed, Hanson Drug Service, Inc., which operates seven pharmacies in Ohio, was granted leave to intervene. The defendant Metropolitan is an insurance company whose corporate headquarters are in New York.

Plaintiffs commenced this action in order to prevent the defendant from auditing their records relating to their participation in Metropolitan's MediMET third-party prescription drug program. The MediMET program, which was established in 1969, is a plan through which employees of participating employers may purchase prescription drugs at reduced rates. As part of the MediMET program, Metropolitan entered into agreements, known as the MediMET Agreements, with approximately 30,000 pharmacies throughout the nation, including a number within the State of Ohio.

Under a typical MediMET plan, a prescription for a covered drug is submitted by the patient to a participating pharmacist along with a card identifying the patient as eligible to receive benefits under the program. The patient pays a small deductible, and the pharmacist fills the prescription and bills Metropolitan through a universal claim form or electronic means for pay-

ment under terms of the MediMET Agreement.

In order to participate in the MediMET program, pharmacists execute a MediMET Prescription Drug Agreement. The terms of the agreement are non-negotiable and participating pharmacists voluntarily enter into them. The MediMET Agreement contains the following provision regarding payment:

> Metropolitan will pay Participating Provider an amount determined in accordance with Item F of the Schedule for Covered Drugs dispensed to Eligible Persons less the applicable co-payment amount set forth in Item D of the Schedule which co-payment amount is payable by the Eligible Person for each Prescription Order or refill.

App. 64–65. Item F, which provides the terms of payment to participating pharmacists, bases payment on the "Acquisition Cost Plus Dispensing Fee" formula. "Acquisition Cost" is defined as:

> the actual cost of a Covered Drug to Participating Provider as determined by Metropolitan, including trade and volume discounts and other allowances.

App. 64. Under the MediMET Agreement, Metropolitan is allowed to inspect the records of the participating pharmacies:

> Metropolitan or its duly authorized agents shall have the right at reasonable intervals and during regular business hours of Participating Provider to review such business records and prescription files of Participating Provider as Metropolitan or its duly authorized agents deem necessary to assure compliance with the terms of this Agreement.

App. 65. The MediMET Agreement also gives Metropolitan the right to unilaterally terminate the agreement with any pharmacy:

> This agreement shall remain in full force and effect until terminated by either party effective upon at least (30) days written notice to the other, except that Metropolitan reserves the right to terminate, effective upon receipt of written notice

by Participating Provider, for violation of this Agreement or for other good cause.

App. 65. Upon presentation of a prescription to a participating pharmacy, persons covered under the MediMET program sign a "Universal Claim Form" in which they agree to release information pertaining to their claim to Metropolitan. The release specifically provides that:

> I authorize release of all information pertaining to this claim to the plan administrator, underwriter, sponsor, policymaker and the employer.

Once the patient has completed the claim form, the pharmacist inserts information into the claim form regarding the drugs dispensed and the cost of the drugs, and submits a copy of the form to Metropolitan for payment. A participating pharmacy may also submit its claim to Metropolitan through the tape-to-tape program. The tape-to-tape program is a system that allows a pharmacist to electronically transfer its claims directly to Metropolitan's computer.

Some of the plaintiffs in this action have admitted that they do not indicate the actual acquisition cost of the drugs on the claim form, but instead indicate the "Average Wholesale Price".[1] Furthermore, these plaintiffs conceded that the price submitted to Metropolitan based on the "Average Wholesale Price" formula is often not the actual cost incurred.

Pursuant to its contractual rights, Metropolitan has audited a number of Ohio pharmacies under the provisions of the Agreement. In 1975, Metropolitan audited one of the pharmacies operated by plaintiff-intervenor Hanson and found overpayments. The two parties reached a settlement concerning these overpayments. On January 7, 1985, plaintiff Mullaney's pharmacies were audited by Metropolitan. Subsequently, Mullaney received a bill indicating an overpayment of approximately $8,000. Three weeks later he received a letter informing him that payment for future

---

1. "Average wholesale price" is determined by surveying a number of drug wholesalers and determining how much they charge for a particular drug.

claims would be withheld unless the alleged overpayment was refunded.

On July 16 and 17, 1985, Metropolitan conducted a second audit of plaintiff-intervenor Hanson's records. On August 9, 1985, Metropolitan demanded that Hanson refund $76,975.33 in alleged overpayments. Hanson refused to pay. On October 22, 1985, Metropolitan sent a letter to Hanson threatening termination of the MediMET Agreement unless the amount owed was paid. On November 25, 1985, Metropolitan notified Hanson that it would terminate the MediMET Agreement in thirty days.

On April 10, 1985, plaintiffs commenced this action by filing a complaint in the Court of Common Pleas in Ohio seeking to bar Metropolitan from auditing the records of participating pharmacies. Plaintiffs contended that the audits were barred by an Ohio statute and the terms of the Medi-MET Agreement. Accordingly, plaintiffs argued that Metropolitan's threats to terminate the agreement with pharmacies that refused to refund overpayments was made in bad faith and that Metropolitan was not within its contractual rights.

After the complaint was filed, Metropolitan moved to have the case removed to federal court. The motion was granted. Plaintiffs then filed a motion for an order enjoining Metropolitan from conducting audits or terminating its agreements with participating Ohio pharmacists. The district court construed the motion as a motion seeking preliminary injunctive relief. A hearing was held on February 20, 1986, and in an opinion issued on July 15, 1986, the district court denied the motion.

The district court's opinion addressed three contentions raised by plaintiffs. Plaintiffs first argued that Metropolitan was precluded from auditing their records by O.R.C. § 3719.13, which provides that:

> Prescriptions, orders, and records, required by Chapter 3719, of the Revised Code, and stocks of dangerous drugs and controlled substances, shall be open for inspection only to federal, state, county, and municipal officers, and employees of the state board of pharmacy whose duty it is to enforce the laws of this state or

of the United States relating to controlled substances.... No person having knowledge of any such prescription, order, or record shall divulge such knowledge, except in connection with a prosecution or proceeding in court or before a licensing or registration board or officer, to which prosecution or proceeding the person to whom such prescriptions, orders, or records relate is a party.

Ohio Rev.Code Ann. § 3719.13 (Baldwin Supp.1986). Plaintiffs maintained that this statute should be construed broadly to preclude audits of their drug purchases and prescription records. The court rejected this argument, noting that each participating patient in the program signed the Universal Claim Form that allowed Metropolitan access to certain information. The court stated that:

> This claim form includes information regarding the cardholder and recipient's name, the pharmacy name, the prescription numbers, the national drug code numbers for drugs provided and the quantity of drugs provided. Plaintiffs have failed to show that any prescription information is sought by the Defendant in its audits that has not already been revealed by the Universal Claim Forms. Furthermore, the Court can find no basis for construing the statute to protect a pharmacy's *purchasing* records—the administrative regulations interpreting the statutes apply the disclosure limits only to *dispensing* (prescription) information.... Plaintiffs have failed to show that the material Defendant has sought in its audits are [sic] of the type protected by the statute....

App. 27 (emphasis in original and citations omitted). The court also noted that plaintiffs had failed to show that the waiver signed by the MediMET patients on the Universal Claim Form would not bar prosecution of a pharmacy under O.R.C. § 3719.-13. In light of such a release, the court found that plaintiffs needed to make at least some showing of a probability of actual prosecution under the statute to meet their burden of showing a strong probability of success at trial on the merits. The

court found that plaintiffs had failed to do this.

Plaintiffs' second contention was that Metropolitan's audits, overpayment calculations, and threats to terminate the agreement with plaintiffs violated their rights under the MediMET Agreement. The district court reviewed the relevant contractual provisions and concluded that, on their face, these provisions appeared to give Metropolitan the power to engage in precisely that conduct which plaintiffs sought to enjoin.

Plaintiffs finally contended that since Metropolitan regularly determined the acquisition cost of the drugs on the monthly statements submitted by the pharmacies for reimbursement purposes, Metropolitan was barred from redetermining acquisition costs through an audit. Plaintiffs argued that Metropolitan had waived its right to determine the price of the drugs through the acquisition cost method by its practice of accepting the price submitted by the pharmacists on their monthly statements, which often was based on average wholesale cost. The court rejected this argument as well and held that Metropolitan had not by its course of performance waived the agreement's acquisition cost term of payment. The court observed that average wholesale price was quite different from acquisition cost. It then noted that there was no basis for the conclusion that simply because Metropolitan regularly paid the claims submitted by the pharmacies, such claims often being based on the average wholesale price, it had waived its right to pay only the acquisition cost. The court found this to be especially true in light of the auditing provision in the contract and Metropolitan's ongoing auditing program used to determine overpayments.

The court concluded that since plaintiffs had not shown a strong probability of suc-

cess on the merits, they had not established a sufficient basis to have a preliminary injunction granted. Plaintiffs now appeal.

## II.

In reviewing a district court's order granting or denying a preliminary injunction, the appellate court's duty is limited to determining if the trial court abused its discretion in rendering preliminary relief. *See American Motors Sales Corp. v. Runke*, 708 F.2d 202, 205 (6th Cir.1983). "A district court abuses its discretion when it relies on clearly erroneous findings of fact, or when it improperly applies the law or uses an erroneous legal standard." *Christian Schmidt Brewing Co. v. G. Heileman Brewing Co.*, 753 F.2d 1354, 1356 (6th Cir.) (citations omitted), *cert. dismissed*, 469 U.S. 1200, 105 S.Ct. 1155, 84 L.Ed.2d 309 (1985); *see also* 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2962 (1973). Prior to reaching its decision on whether to grant or deny an injunction, the district court is required to consider four factors:

1) Whether the movant has shown a strong or substantial likelihood or probability of success on the merits.

2) Whether the movant has shown irreparable injury.

3) Whether the preliminary injunction could harm third parties.

4) Whether the public interest would be served by issuing the preliminary injunction.

*Frisch's Restaurant, Inc. v. Shoney's, Inc.*, 759 F.2d 1261, 1263 (6th Cir.1985).

 In this instance, the district court only considered the first factor. After finding that plaintiffs had not established a strong probability of success on the merits, the court declined to consider the three remaining factors.[2] Plaintiffs now contend

---

**2.** A finding that the movant has not established a strong probability of success on the merits will not preclude a court from exercising its discretion to issue a preliminary injunction if the movant has, at a minimum, "show[n] serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant if the injunction is

issued." *Friendship Materials, Inc. v. Michigan Brick, Inc.*, 679 F.2d 100, 105 (6th Cir.1982). In the instant case, however, plaintiffs failed to show any irreparable harm that they would suffer that would "decidedly outweigh" the prospective harm to Metropolitan if the preliminary injunction were granted. *See Frisch's*, 759 F.2d 1270. Thus, the district court did not

that the district court abused its discretion in refusing to grant the preliminary injunction. Plaintiffs first argue that the district court failed to consider a relevant section of the Ohio Revised Code in its analysis of the agreement at issue. Plaintiffs claim that the agreement is an "open price term" contract under O.R.C. § 1302.18 and the district court erred in failing to hold that the agreement is governed by that statute. Section 1302.18 provides in part that:

 (A) The parties if they so intend can conclude a contract for sale even though the price is not settled. In such a case the price is a reasonable price at the time for delivery if:

 (1) nothing is said as to price; or

 (2) the price is left to be agreed by the parties and they fail to agree; or

 (3) the price is to be fixed in terms of some agreed market or other standard as set or recorded by a third person or agency and if it is not so set or recorded.

Ohio Rev.Code Ann. § 1302.18(A) (Baldwins 1978). Plaintiffs' contention that this section is applicable to this case is incorrect for the simple reason that the agreement at issue is not an open price contract. The agreement sets the price as acquisition cost plus dispensing fee. If a formula is specified for determining price, the price term is not left open and § 1302.18 is not applicable. *See Board of Comm. v. Annadale Scrap Co.*, 60 Ohio App.2d 415, 398 N.E.2d 810 (1978).

 ■ Plaintiffs next assert that O.R.C. § 3719.13, quoted *supra*, which governs disclosure of prescription records, should be construed broadly to preclude audits of their purchasing and financial records. Plaintiffs contend that if they comply with Metropolitan's audit request, they will be subject to prosecution. Plaintiffs interpretation of the statute is incorrect for two reasons. First, the statute only limits disclosure of dispensing information. *See* Ohio Admin.Code § 4729–5–17. It does not apply to the purchasing and financial records sought by Metropolitan. Second, the patients have, by signing the Universal

Claim Form, expressly authorized the pharmacies to disclose certain information to Metropolitan. The information sought by Metropolitan through the audits is the same information that the patients have agreed to have disclosed by signing the claim form. Consequently, compliance with the agreement by plaintiffs can be achieved without any violation of the law.

 ■ Plaintiffs finally contend that Metropolitan's actions are contrary to reasonable commercial standards of fair dealing and obligations of good faith imposed by O.R.C. § 1302.18. Plaintiffs argue that since Metropolitan sets the price of the drugs when it makes monthly payments to them based on their claims, Metropolitan acts in bad faith when it later audits their records and resets the price. Plaintiffs contend, in essence, that if they submit an inflated claim and that claim is paid by Metropolitan, Metropolitan is precluded from later challenging the price paid.

 Plaintiffs' argument is unconvincing. Under the terms of the agreement, the initial price is set by the pharmacists when they submit their claims. Nothing in the agreement states that this is the price that Metropolitan must pay or that if Metropolitan does make payment it cannot later audit the pharmacists and demand reimbursement for overpayment. Indeed, the agreement specifically allows Metropolitan to conduct audits. If the interpretation proposed by plaintiffs were accepted, this term of the agreement would be rendered meaningless. Metropolitan makes monthly payments in reliance on the belief that the pharmacists are making fair claims based on acquisition costs. If a pharmacist makes a false claim, and that claim is paid, Metropolitan is still free to audit the pharmacist and demand recovery of any overpayments. That is why the auditing provision is included in the agreement. By paying the claim, Metropolitan is *not* agreeing that the price submitted by the pharmacist is an accurate price. By the terms of the agreement, Metropolitan reserves to itself the right to later conduct an audit. Metro-

abuse its discretion in considering only the first of the four factors.

politan does not act in bad faith by doing precisely what is called for by the agreement.

Accordingly, the judgment of the district court is AFFIRMED.